Health Services Planning and Review Board
No. 2007-800

APPEAL OF PARKLAND MEDICAL CENTER & a.
(New Hampshire Health Services Planning and Review Board)

Argued: September 17, 2008
Opinion Issued: November 7, 2008

*Orr & Reno, P.A.*, of Concord (*John A. Malmberg* and *Jessica E. Storey* on the brief, and *Mr. Malmberg* orally), for the petitioners.

*Shaheen & Gordon, P.A.*, of Concord (*Steven M. Gordon* and *Arpiar G. Saunders, Jr.* on the brief, and *Mr. Gordon* orally), for the respondent.

DUGGAN, J. The petitioners, Parkland Medical Center, Derry Medical Center and Catholic Medical Center, appeal the decision of the New Hampshire Health Services Planning and Review Board (board) that the Elliot Health System (Elliot) is not required to obtain certificate of need

(CON) review for the Elliot Medical Center at Londonderry project. *See* RSA ch. 151-C (2005 & Supp. 2008). We affirm.

The record reveals the following. In 2005, Elliot began construction of the Elliot Medical Center at Londonderry. The subject property and building are owned by 40 Buttrick Road, LLC, a wholly-owned affiliate of Elliot. On August 19, 2005, Elliot notified the board of its intent to build a Medical Office Building exempt from CON review pursuant to RSA 151-C:13 (Supp. 2008). The board discussed Elliot's letter, but voted not to take action.

In a petition dated October 4, 2006, Elliot requested a determination that the installation of a third fixed magnetic resonance imaging (MRI) scanner would not require a CON. At the October 19, 2006 meeting on the petition, Elliot "suggested the facility would be more than a physicians' office building and would include services of a hospital outpatient department." After investigating the use of the Elliot Medical Center, the petitioners requested the board to determine whether the Elliot Medical Center is subject to CON review. The board initiated an informal investigation, and requested an interpretation of RSA 151-C:13 from the Attorney General. After a hearing on March 15, 2007, the board decided that, with the exception of the "costs associated with Primary Care, Senior Care and Behavioral Health," Elliot Medical Center is subject to CON review. Elliot did not appeal this decision.

The Elliot Medical Center was to be developed in three phases. On July 19, 2007, Elliot filed a petition for determination that Phase I of the project is not subject to CON review (NSR petition). At that time, Phase I had already been completed. Elliot had spent $11,692,411 in construction costs associated with Phase I. Elliot told the board that it intended to sell Phase I to a non-affiliated third party developer, Anagnost Investments, Inc., at fair market value and then lease it back under an operating lease at fair market value. Elliot maintained that after the lease agreement, Phase I would not be subject to CON review because the applicable costs would be below the statutory threshold amount, here $1,537,744. Elliot stated that the entire facility had been declared a condominium, and Elliot intended to sell Phase I from the condominium to a third-party buyer. The petitioners, who were granted intervenor status, argued that the board had already determined that the building required CON review. The board approved the NSR petition on condition that Elliot submit the condominium decla- ration, bylaws, appraisal and lease agreement to the board for review. Elliot created the Buttrick Road Medical Condominium and submitted the documents to the board. Elliot and the developer later entered into a purchase and sale agreement transferring the Phase I building (unit 1) for $11.8 million. The petitioners requested reconsideration and rehearing. The requests were denied. This appeal followed.

On appeal, the petitioners argue that the board erred in applying the CON statute for three reasons: (1) the board ignored its unanimous decision on March 15, 2007, that the Elliot Medical Center requires CON review; (2) the board failed to include the operating lease payments in determining whether the costs exceeded the statutory threshold; and (3) the board failed to require a CON for the transfer of ownership.

Appeals from a decision of the board are brought pursuant to RSA 151-C:10 (2005), and are governed by RSA chapter 541 (2007 & Supp. 2008). We will affirm the decision of the board unless we find it to be "arbitrary or capricious or not made in compliance with applicable law." RSA 151-C:10, III; *see also* RSA 541:13 (2007).

RSA chapter 151-C governs CON review of proposed new institutional health services, a process overseen by the board. RSA 151-C:4 (Supp. 2008) states the basic principles:

> I. No new institutional health service shall be offered or developed within the state, nor shall any arrangement or commitment for financing the offering or developing of a new institutional health service be made, except pursuant to obtaining a certificate of need for such service.
>
> II. No certificate of need shall be granted by the board unless a standard has been developed which delineates the need for the service and outlines the criteria which must be met by any person proposing such a service.

RSA 151-C:5, II provides a list of "new institutional health services" that require the board to develop standards for the proposed facilities or services, and thus require CON review. *See* RSA 151-C:2, XXXVI (2005) (a "standard" is "a health policy guideline"). Included within that list are the transfer of ownership of an existing health care facility, *see* RSA 151-C:5, II(b), and the development of a health care facility requiring a capital expenditure in excess of a set amount, *see* RSA 151-C:5, II(f)(1). There are, however, facilities and services that are exempt from CON review pursuant to RSA 151-C:13. In *Appeal of Portsmouth Regional Hospital,* we stated:

> Once the board determines that a project is exempt under one of the provisions of RSA 151-C:13, the project is not subject to review under the other provisions of RSA chapter 151-C and it becomes unnecessary to determine whether the board would normally be required to develop standards for the institution under RSA 151-C:5, II.

*Appeal of Portsmouth Regional Hosp.,* 148 N.H. 55, 58 (2002).

RSA 151-C:13, I(f) provides that such exemptions include: "Facilities and services which are intended to serve only outpatients and which do not require construction of greater than the appropriate threshold level, as determined under RSA 151-C:5, II(a) or RSA 151-C:5, II(f) or new equipment costing more than $400,000." In determining whether a project is exempt under RSA 151-C:13, I(f), we stated: "It is clear from the statute's plain language that the only consideration in determining whether a facility is excluded from RSA chapter 151-C is whether the *construction costs* exceed the statutory threshold level." *Appeal of Portsmouth Regional Hosp.*, 148 N.H. at 58 (emphasis added). The statutory threshold level is the monetary amount stated in RSA 151-C:5, II, not a calculation of the capital expenditure. *Id.*

The relevant inflation-adjusted statutory threshold for this project is $1,537,744. Thus, for the project to be exempt from review pursuant to RSA 151-C:5, II(f), the construction costs of the project must be less than $1,537,744. Because the construction costs here are approximately $11,600,000, and exceed the statutory threshold, Elliot is not exempt; therefore, it becomes necessary to determine whether the board would be required to develop standards for this institution under RSA 151-C:5, II.

We first turn to the petitioners' argument that the board erred in ignoring its prior decision. The petitioners argue that the Elliot Medical Center was already constructed and the costs exceeded the statutory threshold. The petitioners argue that the Elliot Medical Center's very existence violated the CON statute. The petitioners further argue that Elliot did not appeal the board's prior decision that a CON was required, and thus that decision became final. The petitioners point out that the only change in the NSR petition was the ownership structure.

The petitioners' argument requests application of the doctrine of administrative finality. *See Johnson Ambulatory Surg. Assoc. v. Nolan*, 755 A.2d 799, 808 (R.I. 2000) ("Under this doctrine, when an administrative agency receives an application for relief and denies it, a subsequent application for the same relief may not be granted absent a showing of a change in material circumstances . . . ."). We have not adopted the doctrine of administrative finality. We have, however, applied a similar test for zoning board of adjustment review in *Fisher v. City of Dover*, 120 N.H. 187 (1980), and its progeny. *Fisher*, 120 N.H. at 190 ("When a material change of circumstances affecting the merits of the application has not occurred or the application is not for a use that materially differs in nature and degree from its predecessor, the board of adjustment may not lawfully reach the merits of the petition.").

■ Assuming without deciding that the reasoning articulated in *Fisher* would be applied to the Health Services Planning and Review Board, Elliot's NSR petition had a material change in circumstances in restructuring the ownership of Phase I. The board, in its decision to require CON review, determined that "a CON was required for Elliot's project as structured." Elliot restructured the ownership of the Elliot Medical Center, forming a condominium and leasing Phase I back from the developer. Elliot then submitted its NSR petition. At the hearing on the NSR petition, when this issue arose, one member stated: "We allow changes all the time and consider[] it as a new proposal . . . ." Elliot thus restructured the ownership consistent with the statutory language and submitted a new petition. *Cf. Morgenstern v. Town of Rye*, 147 N.H. 558, 566 (2002) (holding second petition constituted a new proposal even though it was for the same single family home because it addressed the concern over the impact on wetlands).

Having determined that the board acted lawfully in considering Elliot's NSR petition, we now address the petitioners' argument that the board should have considered the operating lease payments in calculating the capital expenditure. This argument requires us to interpret RSA 151-C:5, II and the definition of "capital expenditure." The interpretation of a statute is a question of law, which we review *de novo. Cloutier v. City of Berlin*, 154 N.H. 13, 17 (2006). We are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. *Id.* We first examine the language of the statute, and, where possible, ascribe the plain and ordinary meaning to the words used. *Id.* When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent, and we will not consider what the legislature might have said or add language that the legislature did not see fit to include. *Id.*

RSA 151-C:5, II provides, in pertinent part: "The board shall develop standards for new institutional health services. These include the following: . . . (f)(1) . . . the construction, development, expansion, renovation, or alteration of any . . . health care facility requiring a capital expenditure of more than [$1,537,744]." "Capital expenditure" is defined as:

> an expenditure which, under generally accepted accounting principles consistently applied, is not properly chargeable as an expense of operation or maintenance, and includes acquisition by purchase, by transfer, or by lease or comparable arrangement, or through donation, if the expenditure would have been considered a capital expenditure if acquisition had been by purchase.

RSA 151-C:2, VI.

The petitioners argue that this definition "specifically includes expenditures to acquire by lease those assets which would have been capital assets if purchased." In drawing this conclusion, the petitioners read the first phrase, "an expenditure which, under generally accepted accounting principles consistently applied, is not properly chargeable as an expense of operation or maintenance" as divorced from the second phrase, "includes acquisition . . . by lease . . . if the expenditure would have been considered a capital expenditure if acquisition had been by purchase," and thus creates a two-part definition. The petitioners then claim that under the second half of the definition, capital assets include real estate leases where there is a useful life of two years or more. We disagree.

■RSA 151-C:2, VI qualifies "an expenditure" with the language "under generally accepted accounting principles consistently applied." Therefore, the plain meaning of the statute requires one to look to the generally accepted accounting principles (GAAP) to determine if any expenditure is a capital expenditure. Because the definition of "an expenditure" is initially qualified as requiring application of GAAP, the second phrase "includes acquisition by . . . lease" also requires GAAP application.

To adopt the petitioners' interpretation of RSA 151-C:2, VI would limit the consistency of applying GAAP and would also create inconsistency within the CON statute. Specifically, the statutory definition of "capital expenditure" would have an internal inconsistency, where GAAP applies to all expenditures that are "not properly chargeable as an expense of operation or maintenance" but would not apply to any "acquisition by purchase, by transfer, or by lease or comparable arrangement, or through donation, if the expenditure would have been considered a capital expenditure if acquisition had been by purchase." This inconsistency vanishes if the statute is read to mean that for a lease to be a capital expenditure, it must be a capital asset as required and defined by GAAP.

■■ In 1973, the accounting profession created the Financial Accounting Standards Board (FASB) to determine and promulgate accounting principles. D. HERWITZ & M. BARRETT, ACCOUNTING FOR LAWYERS ch. 2(C) at 129 (2d ed. 1997). Pursuant to the FASB accounting principles, not all real estate leases are capital assets. "[A] lease that transfers substantially all of the benefits and risks incident to the ownership of property should be accounted for as the acquisition of an asset and the incurrence of an obligation by the lessee . . . . All other leases should be accounted for as operating leases." RESEARCH AND DEV. ARRANGEMENTS, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS Vol. II, § L10.103 (Financial Ac-

counting Standards Bd. 2008). "Sale-leaseback transactions involve the sale of property by the owner and a lease of the property back to the seller." *Id.* § L10.128.

> If a particular lease [including sale-leaseback transactions] meets any one of the following classification criteria, it is a capital lease:
>
> a. The lease transfers ownership of the property to the lessee by the end of the lease term.
>
> b. The lease contains an option to purchase the leased property at a bargain price.
>
> c. The lease term is equal to or greater than 75 percent of the estimated economic life of the leased property.
>
> d. The present value of rental and other minimum lease payments equals or exceeds 90 percent of the fair value of the leased property less any investment tax credit retained by the lessor.

*Id.* § L10 Summary.

■ The parties appear to agree that none of these criteria apply. The petitioners state: "The Lease was carefully structured to comply with GAAP requirements . . . ." and "Elliot has found a buyer . . . who will lease Phase 1 back to Elliot in a structure that satisfies — barely — the criteria of an operating lease under generally accepted accounting principles . . . ." The petitioners note in their brief that the lease would fall within criteria § L10.128.d if Elliot exercises its option to renew for a second term of ten years. This issue, however, is a hypothetical not now before us. On the record before us, we conclude that this operating lease is not included within the definition of capital expenditures pursuant to RSA 151-C:2, VI and that the board acted properly in not including the lease payments in considering the NSR petition pursuant to RSA 151-C:5, II(f).

We next address the petitioners' argument that CON review was required when Elliot transferred ownership of the facility. RSA 151-C:5, II(b) provides that new institutional health services subject to review include: "The transfer of ownership, in whole or in part, of an existing health care facility, or the acquisition of all or substantially all of its assets or stock . . . ." " 'Transfer of ownership' means a change of ownership interest, in whole or in part, from one person to another by way of purchase, donation, lease, transfer or comparable arrangement." N.H. ADMIN. RULES, He-Hea 1202.01(h). "In accordance with RSA 151-C:5, II(b), any health care facility shall obtain a [CON] to transfer more than

50% of its total assets if it is not certified under Title XVIII or Title XIX of the Social Security Act at the time of transfer of ownership." *Id.* He-Hea 1201.01(a).

Here, three transfers occurred. First, the entire Elliot Medical Center was transferred from 40 Buttrick Road, LLC to the Buttrick Road Medical Condominium by a condominium declaration. Second, Buttrick Road Medical Condominium sold Phase I to the developer. Third, the developer leased Phase I to Elliot. The petitioners argue that "[t]he entirety of the Elliot Medical Center at Londonderry health care facility was the subject of the sale and leaseback transaction." The petitioners thus argue that "[b]ecause 100% of the Elliot Medical Center at Londonderry health care facility was . . . transferred, a CON is required for the transfer accomplished in the first step of the sale and leaseback transaction."

 Under the plain meaning of the language in RSA 151-C:5, II(b), CON review is required in transferring even part of an existing health care facility. Thus, the issue becomes whether any of the transfers involved an existing health care facility. RSA 151-C:2, XV-a defines "health care facility" to mean "hospitals, ambulatory surgical facilities, specialty hospitals and licensed nursing homes including all services and property owned by such. Health care facilities shall include facilities which are publicly or privately owned or for-profit or not-for-profit, and which are licensed or *required to be licensed in whole or in part by the state.*" (Emphasis added.)

 Phase I currently offers primary care, senior care and behavioral health services. These services do not require a license. *See* RSA 151:2, II(e) (Supp. 2008). Elliot represents, and the petitioners do not dispute, that Phase I is not licensed. Thus, the transfer of these services did not trigger CON review.

With the NSR petition, Elliot intends to offer urgent care. Although the addition of urgent care would require licensing, *see* RSA 151:2, I(d), this service was not offered when any of the transfers occurred. Phase I, therefore, is not an *existing* health care facility. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 796 (unabridged ed. 2002) ("Existing" is defined as "to have actual or real being"). Because none of the transfers involved existing health care facilities, the board did not err in not requiring CON review.

*Affirmed.*

BRODERICK, C.J., and GALWAY and HICKS, JJ., concurred; DALIANIS, J., concurred specially.

DALIANIS, J., concurring specially. I concur in the majority opinion because I believe that the plain meaning of the applicable statutes compels the result reached. As the majority aptly holds, although under the plain language of RSA 151-C:5, II(b) (2005), certificate of need (CON) review is required when transferring even a part of an existing health care facility, Phase I of the Elliot Medical Center at Londonderry Project is not an existing health care facility as that term is defined in RSA 151-C:2, XV-a (2005). Thus, none of the transfers at issue trigger CON review. I regard Elliot Health System's transfer of ownership of Phase I as a clever way to circumvent CON review. Although Elliot Health System knew that CON review would be required for this facility once it began to offer urgent care, nevertheless, before the facility offered urgent care, Elliot Health System arranged to sell it to the developer for this sale and lease-back deal to avoid CON review. While this kind of lease-back deal is allowed under the current statutory scheme, the legislature might wish to revisit RSA chapter 151-C (2005 & Supp. 2008) in light of this case.