Department of Environmental Services
No. 2011-381

APPEAL OF TOWN OF SEABROOK
(New Hampshire Department of Environmental Services)

Argued: February 9, 2012
Opinion Issued: May 22, 2012

638

*Donahue, Tucker & Ciandella*, of Exeter (*Robert D. Ciandella & a.* on the brief, and *Mr. Ciandella* orally), for the petitioner, Town of Seabrook.

*Pierce Atwood, LLP*, of Portsmouth (*Jonathan A. Block & a.* on the brief, and *Mr. Block* orally), for the respondent, NextEra Energy Seabrook, LLC.

*Michael A. Delaney*, attorney general (*K. Allen Brooks*, senior assistant attorney general, on the brief), for the New Hampshire Department of Environmental Services.

HICKS, J. The petitioner, Town of Seabrook, appeals an order of the New Hampshire Department of Environmental Services (DES) granting the respondent, NextEra Energy Seabrook, LLC (NextEra), several tax exemptions under RSA 72:12-a (Supp. 2011). We affirm in part and reverse in part.

The following facts are supported by the record. NextEra is the majority shareholder and managing agent of the Seabrook Nuclear Power Station (Plant), located in Seabrook, near the Atlantic Ocean, the Browns River, and the Hampton Harbor marsh. The Plant is a single unit nuclear electric generating facility with a four-loop, pressurized water reactor. To produce electricity, the Plant uses nuclear fuel to create steam that is used to power a turbine generator. The water used during this process is drawn from and discharged to the Atlantic Ocean via intake and discharge tunnels.

In 1982, a previous owner of the Plant applied for local property tax exemptions pursuant to RSA 72:12-a. Two separate appeals to this court followed. *See Appeal of Town of Hampton Falls*, 126 N.H. 805 (1985); *Appeal of Public Serv. Co. of N.H.*, 124 N.H. 79 (1983). The Plant ultimately received various tax exemptions. The relevant tax exemption statute, RSA 72:12-a, provides the following:

> . Any person, firm or corporation which builds, constructs, installs or places in use in this state any treatment facility, device, appliance, or installation wholly or partly for the purpose of reducing, controlling, or eliminating any source of air or water pollution shall be entitled to have the value of said facility and any real estate necessary therefor, or a percentage thereof determined in accordance with this section, exempted from the taxes levied under this chapter for the period of years in which the facility, device, appliance, or installation is used in accordance with the provisions of this section.

RSA 72:12-a, I.

In 2010, pursuant to this statute, NextEra submitted an application to DES to obtain tax exemptions for the Plant, in part because the New Hampshire Department of Revenue Administration requested that the exemptions be updated. NextEra's Application (Application) was largely duplicative of the prior application. NextEra specifically claimed that the following facilities are entitled to the exemption:

**Air Pollution Control Facilities:**
1. Containment Structure
2. Containment Spray System
3. Containment Cooling System
4. Combustible Gas Control System
5. Containment Enclosure [and Fission Product Removal System]
6. Primary Auxiliary Building Filtered Exhaust System
7. Fuel Storage Building Exhaust System
8. Waste Processing Building Exhaust System
9. Containment On-Line Purge Exhaust System
10. Vent Stack
11. Radioactive Gaseous Waste System

**Water Pollution Control Facilities:**
12. Storm Water Run-Off and Treatment System
13. Chemical and Oily Waste System

14. Sanitary Waste System

15. Circulating Water Discharge Tunnel

16. Circulating Water Intake Tunnel

17. Radioactive Liquid Waste System

18. Steam Generator Blowdown Treatment System

19. Boron Recycle System

20. Service Water Cooling Tower

21. Demineralizer Regeneration Waste Neutralization System

In December 2010, DES notified the Town of Seabrook (Town) that it could submit comments on the Application. The Town asked DES to conduct a public hearing on the Application. The Town also alleged that NextEra failed to provide it with sufficient information to evaluate the Application.

DES declined to conduct a public hearing. The Town submitted comments on the Application. It also filed the following: Town of Seabrook's Petition for Intervention, Town of Seabrook's Motion for Reconsideration, and Town of Seabrook's Petition to Deny NextEra's Requested Exemptions or Limit DES Review of NextEra's Application Based Upon Prior Tax Exemption Determinations. NextEra filed responses. DES, however, declined to rule on any of the Town's filings on the basis that the 2010 Application was a non-adjudicative proceeding. In the spring of 2011, DES issued a lengthy order ruling that all of the aforementioned facilities are, at least to some extent, eligible for the exemption under RSA 72:12-a.

The Town has appealed this decision to us. *See* RSA 72:12-a, VI. It argues: (1) that DES erroneously granted exemptions for facilities that do not meet the requirements of RSA 72:12-a; (2) that there was not sufficient evidence to support DES's decision; (3) that DES was required to hold a hearing; (4) that NextEra's claims are barred by res judicata, collateral estoppel, and finality; and (5) that DES was required to use an adjudicative process.

"The scope of our review of agency decisions under RSA 72:12-a is narrow." *Appeal of Town of Bethlehem*, 154 N.H. 314, 318 (2006). We will overturn DES's decision only if it committed an error of law, or if the appealing party shows by a clear preponderance of evidence that DES's decision is unjust or unreasonable. RSA 541:13 (2007); *Appeal of Town of Rindge*, 158 N.H. 21, 24 (2008). Bearing this in mind, we address each issue in turn.

*I. RSA 72:12-a*

█ Pursuant to the text of RSA 72:12-a, I, a facility is eligible for a tax exemption (1) if it is a treatment facility and (2) if its purpose is, at least partially, to control, reduce, or eliminate any source of air or water pollution. To satisfy the first requirement, the facility in question must perform some sort of "treatment," which we have interpreted as "the subjection of something to some action or process with a special end in view, the end often being to improve the quality of the thing undergoing treatment." *Appeal of City of Berlin*, 131 N.H. 285, 290 (1988). With regard to the second requirement, although the statute is not concerned with the "size, shape, effectiveness, or virtually any other criteria relative to the pollution control [facility itself]," *N. Country Envtl. Servs. v. State of N.H.*, 157 N.H. 15, 21 (2008), it nevertheless requires the facility to have the "purpose of reducing, controlling, or eliminating any source of air or water pollution," RSA 72:12-a, I. The statute additionally provides that the exemption is available for as long as the facility "is used in accordance with the provisions of [RSA 72:12-a]." *Id.*

Some of the facilities at issue do not operate on a regular basis because they were designed to operate only in the event of a loss-of-coolant accident (LOCA). Nevertheless, DES ruled that the exemption applies to these facilities, which include the containment structure, the containment spray system, the containment cooling system, the combustible gas control system, and the containment enclosure and fission product removal system. DES ruled that the containment structure and the containment enclosure and fission product removal system are treatment facilities, relying on what it called our "broad interpretation" of the statutory term "treatment." It determined that the containment structure has a partial pollution control purpose and is entitled to an 87% exemption. It determined that the containment enclosure and fission product removal system was "installed for the sole purpose of air pollution control" and is entitled to a 100% exemption. As to the containment spray system, the containment cooling system, and the combustible gas control system, DES ruled that they are integral components of the containment structure and are entitled to the exemption to the extent they serve a pollution control purpose.

The Town argues that these facilities are not eligible for the exemption because the plain language of the statute precludes exemptions for facilities "which might be used at some point in the future to control pollution resulting from an extraordinary disaster or emergency . . . when those [facilities are] standing by and [are] not actually being used to treat pollution." According to the Town, the facilities would, however, be entitled to the exemption in the years when they are actively used. To support its

interpretation, the Town points to the language in RSA 72:12-a, I, that states the exemption is available "for the period of years in which the facility . . . *is used* in accordance with the provisions of this section." In the same vein, the Town argues that making the exemption available in years in which a facility is not actively used would be inconsistent with the statutory term "treatment."

The Town further contends that, contrary to DES's ruling, the statute does not provide the exemption for integral components of treatment facilities. In its view, each component part must meet the statutory test. Finally, the Town argues that some of the facilities are not entitled to the exemption because their purpose is not to control or eliminate pollution, but rather to act as a safety mechanism in the event of a LOCA.

NextEra disagrees with the Town's construction of the statute. It first argues that the "is used" clause does not support the Town's position. That clause formerly provided that the exemption was available "for a period of 25 years." RSA 72:12-a, I (1991). In 1998, the legislature replaced it with the current language. *See* Laws 1998, ch. 66 (effective April 1, 1998). Relying on legislative history, NextEra argues that the "is used" language was merely added to alter the time limitation on the exemption, and that there is no evidence that the legislature enacted this change to "restrict the applicability of the exemption to facilities or systems that continuously treat pollution."

NextEra also asserts that the facilities "are 'used' because they are, and must be, deployed in place and ready as long as the [P]lant itself is in operation." According to NextEra, our case law demonstrates that active, continuous use is not required to qualify for the exemption under RSA 72:12-a. For example, it points to two cases in which we upheld DES orders ruling that the exemption applies to storm water management systems — systems which operate only in the event of rain. *See Appeal of Town of Bethlehem*, 154 N.H. at 320-21; *Appeal of Town of Newington*, 149 N.H. 347, 351 (2003). With regard to the Town's argument about integral components, NextEra argues that the term "facilities" encompasses the facilities' integral parts and that the Town's interpretation of the statute would defeat its purpose because "broken into small enough component parts, no part could individually control pollution and the statute would have no application." Lastly, NextEra argues that the Town's interpretation of the statute is inconsistent with its underlying purpose, which we have held is to encourage the construction of pollution control facilities through tax exemptions. *See Appeal of Town of Bethlehem*, 154 N.H. at 323.

Faced with this disagreement over the meaning of RSA 72:12-a, we must interpret its language. NextEra argues that DES's interpretation of RSA 72:12-a is entitled to deference. It relies on *Appeal of Town of Hampton*

*Falls*, 126 N.H. at 809, in which we said that "the legislature has entrusted [DES] with primary responsibility to administer RSA 72:12-a . . . [and thus DES's] interpretations of the terms of RSA 72:12-a . . . are entitled to great deference." The Town argues that we need not give DES's interpretation deference. It relies on *Appeal of Town of Rindge*, 158 N.H. at 24, in which we said that "we review an agency's interpretation of a statute *de novo*," and *Appeal of Town of Bethlehem*, 154 N.H. at 319, in which we said that "we are the final arbiter of the legislature's intent as expressed in the words of [RSA 72:12-a]."

■ Regardless of the distinctions among these cases, it is well established in our case law that an interpretation of a statute by the agency charged with its administration is entitled to deference. *See, e.g., Appeal of Morton*, 158 N.H. 76, 78-79 (2008) ("[W]e accord deference to the [agency's] interpretation [of the statute it administers] . . . ."); *Appeal of Weaver*, 150 N.H. 254, 256 (2003) ("[S]tatutory construction by those charged with its administration is entitled to substantial deference . . . ."); *Appeal of Salem Regional Med. Ctr.*, 134 N.H. 207, 219 (1991) ("[T]he construction of a statute by those charged with its administration is entitled to substantial deference." (quotation omitted)); *N.H. Retirement System v. Sununu*, 126 N.H. 104, 108 (1985) ("[T]he construction of a statute by those charged with its administration is entitled to substantial deference.").

The deference afforded, however, is not absolute. *Appeal of Weaver*, 150 N.H. at 256. We are still the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole, *Appeal of Town of Rindge*, 158 N.H. at 24, and we are not bound by an agency's interpretation of a statute, *see Appeal of Weaver*, 150 N.H. at 256. We thus review an agency's interpretation of a statute *de novo*. *Appeal of Town of Rindge*, 158 N.H. at 24. Furthermore, we will not defer to an agency's interpretation if it clearly conflicts with the express statutory language, *Appeal of Stanton*, 147 N.H. 724, 728 (2002), or if it is plainly incorrect, *Appeal of Levesque*, 136 N.H. 211, 213 (1992).

■ When we interpret a statute, we ascribe the plain and ordinary meaning to the words used. *Appeal of Town of Rindge*, 158 N.H. at 24. We do not look beyond the language of the statute to determine legislative intent if the language is clear and unambiguous. *Id.* Nor will we consider what the legislature might have said or add words the legislature did not include. *Id.*

NextEra has described all of the facilities in question as facilities that collect, contain, and process airborne contaminants that would otherwise be released to the atmosphere during and subsequent to abnormal operating conditions, such as a LOCA. The ultimate interpretive question, then, is

whether the plain language of RSA 72:12-a precludes the tax exemption for facilities that will only treat pollution upon the occurrence of a non-routine event. Our first task is to determine if the containment structure and the containment enclosure and fission product removal system fall within the parameters of the statutory term "treatment facility." We hold that they do not.

As mentioned above, we have interpreted the statutory term "treatment" to mean "the subjection of something to some action or process with a special end in view, the end often being to improve the quality of the thing undergoing treatment." *Appeal of City of Berlin*, 131 N.H. at 290. This definition is phrased in the active voice — it uses the word "subjection" and assumes that something will be "undergoing" treatment. Also, the definition does not describe treatment in a conditional manner: it describes it not as "the *possible* subjection of something to some action," but rather as "the subjection of something to some action." Thus, the term "treatment facility" presumes that the facility will be active in that it will routinely treat pollution, or, put in the language of our definition, will subject something to some action or process. Furthermore, this is not a novel way to interpret the term, for we have upheld the exemption only for facilities which operate on routine intervals. *See, e.g., Appeal of Town of Rindge*, 158 N.H. at 23-26 (upholding tax exemption for wastewater treatment facility that treated wastewater generated by a college campus); *Appeal of Town of Bethlehem*, 154 N.H. at 320-22 (upholding tax exemption for landfill facility components that controlled the runoff of water contaminated by the landfill and controlled the discharge of landfill gases); *Appeal of Town of Newington*, 149 N.H. at 349-52 (upholding tax exemption for a water injection system that injected water into a combustion turbine to reduce its operating temperature, a facility that managed the discharge of storm water, and temporary construction devices that prevented erosion and contained runoff caused by the construction of the primary facility at issue); *Appeal of City of Berlin*, 131 N.H. at 286-87, 291 (upholding tax exemption for tall stack that discharged pollutants created during paper production process); *Appeal of Town of Hampton Falls*, 126 N.H. at 807-08, 812 (upholding tax exemption for Seabrook Nuclear Power Plant discharge tunnels that discharge water used in the electricity generation process). In short, for a facility to be considered a "treatment facility" it must regularly operate.

Here, it is merely speculation whether either the containment structure or the containment enclosure and fission product removal system will ever operate to treat anything. Although the containment structure does protect equipment from the natural elements, in its Application NextEra unequivocally stated that the containment structure and the

containment enclosure and fission product removal system "do not include any elements that are necessary for the normal operation of the Plant." Indeed, these two facilities would operate only in the event of abnormal operating conditions, such as a LOCA, and presumably the Plant operators seek to avoid the catastrophic events that would actually trigger their operation. Thus, the only thing that can be said with certainty is that these facilities have the *potential* to treat something in the case of an accident. The facilities, therefore, are more akin to responsive safety systems; their speculative nature puts them outside the bounds of the statutory term "treatment facility." Accordingly, we hold that the containment structure and the containment enclosure and fission product removal system are not eligible for the RSA 72:12-a tax exemption.

■ The containment spray system, the containment cooling system, and the combustible gas control system are likewise not eligible for the exemption. Even if we assume that integral components of treatment facilities are entitled to the exemption, these facilities still would not qualify because they are components of facilities which themselves are not treatment facilities. Moreover, if we were to consider these facilities individually, they would not qualify because, like the containment structure and the containment enclosure and fission product removal system, they operate only in the event of abnormal operating conditions, such as a LOCA, and, thus, are not treatment facilities.

We need not address the arguments regarding the purpose of the facilities and the underlying rationale of the statute because our holding is dispositive. Neither must we consider whether the facilities here would be eligible for the exemption in years in which they operate in response to an abnormal operating condition because that factual situation is not before us.

## II. Factual Support for DES's Decision

■ The Town next argues that "[t]here was not proper, suitable or sufficient evidence or information for DES to decide NextEra's RSA 72:12-a Application." DES's findings of fact are presumed to be *prima facie* lawful and reasonable, see RSA 541:13; *Appeal of Town of Bethlehem*, 154 N.H. at 318, and this presumption may be overcome only upon a showing that there was no evidence from which DES could conclude as it did, see *Legislative Utility Consumers' Council v. Public Utilities Comm'n*, 118 N.H. 93, 99 (1978). We do not sit as a trier of fact in reviewing DES's findings; nor do we resolve conflicts in the evidence. *See Appeal of Town of Bethlehem*, 154 N.H. at 318, 322. Additionally, "we are reluctant to substitute our judgment for the expertise of administrative officials."

*Appeal of Town of Hampton Falls*, 126 N.H. at 814 (quotation omitted). However, if "[DES's] ruling is devoid of findings of fact that would permit meaningful review," we will vacate and remand its decision for findings sufficient to permit such review. *Appeal of Town of Newington*, 149 N.H at 354-55. And, as stated above, we will overturn a DES decision if the appealing party shows by a clear preponderance of evidence that the decision was unjust or unreasonable. RSA 541:13; *Appeal of Town of Rindge*, 158 N.H. at 24.

The Town first challenges NextEra's Application as a whole. Specifically, it argues that the information provided in the Application was not sufficient to support DES's decision because the "Application contained only brief descriptions of each facility, with citations to documents not provided to DES and with over 150 pages of systems and costs with no explanation or support as to where those costs came from."

We do not agree with this characterization of the Application. The documents cited in the Application were available to DES. NextEra stated that the documents were available for review at the Plant and neither party disputes this, and DES's investigation "included review of . . . information collected during a [visit to the Plant]." NextEra also told the Town that it could review the documents if it so desired; the Town apparently declined to do so. Furthermore, NextEra did provide cost data. The appendix to the Application contained an "Asset Determination" spreadsheet that provided the costs of the relevant assets, descriptions of the assets, the identity tags associated with the assets, and the systems or areas in which the assets are located. That those descriptions were brief and did not cite original supporting documents is of no consequence. As stated above, we will only overturn DES's findings where there is *no evidence* from which DES could conclude as it did. Here, NextEra provided a detailed and lengthy Application, and opened the doors of the Plant to both DES and the Town. Thus, we will not disturb DES's ruling based upon the Town's general challenge to the evidentiary support for NextEra's Application.

The Town next advances several challenges to specific facilities. We address each claim in turn.

### A. Buildings

The Town argues that there was no evidentiary support for DES's decision to grant exemptions for buildings associated with the containment spray system, the containment cooling system, the boron recycle system, and the service water cooling tower. We need not address the containment spray system or the containment cooling system because we have already determined that they do not qualify for the exemption. With regard to the

boron recycle system, the Application specifically explains why the buildings associated with that system are entitled to the exemption, provides a detailed schematic drawing of the system, and provides citations to supporting documents. As to the service water cooling tower, it doesn't appear that there are any buildings associated with the tower, aside from the tower itself. In any event, the Application specifically explains why the tower is entitled to the exemption, provides a detailed schematic drawing of the tower, and provides citations to supporting documents. Therefore, the Town has failed to demonstrate that DES's findings regarding the tower lacked evidentiary support. We accordingly uphold the decision to grant the exemption to the buildings associated with the boron recycle system and the service water cooling tower.

### B. Primary Auxiliary Building Filtered Exhaust System

The Town argues that DES erred in granting a 16.73% exemption for the building floor space occupied by the primary auxiliary building filtered exhaust system because that system's floor space had previously been granted a 9% exemption and, according to the Town, there was no evidence to support an increase in the percentage allocation. We disagree.

In 1984, DES's predecessor agency granted a 9% exemption for the primary auxiliary building because it determined that the primary auxiliary building exhaust system occupies 9% of that building's floor space. However, NextEra supported the increased percentage in its application by explaining that "[t]he Primary Auxiliary Building has a total floor area of 43,325 sq. ft. of which 24,478 sq. ft. is occupied by equipment," and that the "[c]omponents of the Primary Auxiliary Building Exhaust System occupy 4,094 sq. ft." The components of the primary auxiliary building filtered exhaust system (4,094 sq. ft.) make up 16.73% of the total floor space occupied by equipment (24,478 sq. ft.). From that, NextEra concluded that 16.73% of the building is entitled to the exemption. To support its claim, NextEra provided a schematic drawing of the system and cited various supporting documents available for review at the Plant. To explain the discrepancy between the original 9% exemption and the request for a 16.73% exemption, NextEra also explained that "[w]hile no physical changes have been made to the Primary Auxiliary Building to account for the difference between the 9% building space percentage identified in the original Application and the 16.73% set forth in the 2010 Application, the drawings that were available for use at the time the original Application was prepared were still in design development (post-conceptual engineering layout) and did not reflect the final design that was used in the preparation of the 2010 Application. . . . [T]he difference . . . [resulted from] the evolving design of equipment placement and space utilization." DES

ultimately ruled that the building is entitled to a 16.73% exemption, basing its decision on the explanation provided by NextEra.

■ The decision complained of here was nothing more than a mathematical calculation based on that which DES determined to be the relevant amount of space occupied by the primary auxiliary building filtered exhaust system. The Town has failed to show that there was no evidence to support this factual determination. Accordingly, we uphold DES's decision to increase the exemption to 16.73%.

### C. Containment On-line Purge Exhaust System

The Town argues that there was insufficient evidence to support DES's decision to grant a 100% exemption for the containment on-line purge exhaust system. DES found that "[t]he sole purpose of the Containment On-Line Purge Exhaust System is to reduce or eliminate (treat) the airborne radioactive materials (pollution) from an exhaust stream (air) prior to release to the environment." DES accordingly ruled that the system is entitled to a 100% exemption.

The Town argues that "the purge system serves a dual function of maintaining adequate air circulation and temperature changes and of providing some pollution control." According to the Town, DES should have granted an exemption only for "that portion of the purge system that is designed to filter radioactive particles from the air." To support its contention, the Town submitted a report authored by George Sansoucy, a consulting engineer who is, among other things, an expert in valuation of nuclear power plants. That report concluded that "[s]ome portion of this system is generally pollution exempt up to the percent that is in excess of that which is required to maintain adequate normal air circulation and changes through the containment building as it would with any industrial building housing a nuclear reactor."

NextEra claimed that 100% percent of the system is exempt. It stated that "[t]he Air Pollution Control Function of the Containment On-Line Purge Exhaust System is to control and reduce potentially contaminated air released from the Containment Structure." It explained that "[t]his is accomplished by filtering the Containment Structure exhaust air prior to its release through the Plant Vent Stack." It also provided supporting citations to documents available at the Plant and a schematic drawing of the exhaust system.

■ The essence of the Town's argument here is that DES should have resolved the conflicting evidence in its favor and found that only a portion of the system operates to control pollution. However, we do not resolve

conflicts in the evidence, *see Appeal of Town of Bethlehem*, 154 N.H. at 322, and DES had ample evidence to support its conclusion. Accordingly, we find no error in this finding.

### D. Circulating Water Discharge System

The Town argues that there was insufficient evidence to support DES's decision to grant a 100% exemption for the circulating water discharge system. We disagree.

The circulating water system draws cooling seawater from the Atlantic Ocean to absorb the heat associated with the condensing of steam exhausted from the Plant's turbine. After the cooling water mixes with the steam condensation, heated water remains. The circulating water discharge system then transports the heated water back to the ocean through a tunnel that discharges it 5,500 feet from the shoreline. DES found that the discharge system is designed and constructed to convey heated water to a point in the Atlantic Ocean where it can be discharged without polluting or otherwise damaging the Hampton Harbor marsh and estuarine system.

In *Appeal of Town of Hampton Falls*, 126 N.H. at 814, in which we addressed the 1982 tax exemption application, we upheld an agency decision to grant a 100% exemption to this system. There, the then owner of the Plant claimed that it could have simply discharged the water into the Browns River, the river that feeds the Hampton Harbor marsh, which it asserted is "incapable of receiving the physical quantity of water . . . or the heat without environmental damage." *Id.* at 813 (quotation omitted). It therefore argued that the entire system is entitled to the exemption because it is intended to prevent the environmental damage that would be caused by discharging the water into the Browns River. *Id.*

The Town of Hampton Falls first argued that the system is not a pollution control facility because it merely transports heated water to a point in the ocean where cooling will occur through dispersion in the ocean and thus it is the ocean, not the tunnel, that controls the pollution. *Id.* at 811. We disagreed. We first noted that the statute does not actually require the facility in question to remove pollution, but rather requires the facility to reduce, control, *or* eliminate pollution. *Id.* at 811. Then, we concluded that the discharge system does reduce and control thermal pollution because the transportation of the heated water to the ocean minimizes the effects of thermal discharge on the local estuarine system. *Id.* at 811-12.

The Town of Hampton Falls also took issue with the claim about the volume of water, arguing that damage caused by a high volume of water could not be characterized as damage caused by a pollutant and thus the system is entitled only to an exemption to the extent that it reduces thermal pollution. *Id.* at 812-13. A high-level employee of the Plant testified that the

function of transporting a large volume of water cannot be separated from the function of transporting heated water because "without the heat, there would be no need to discharge the water." *Id.* at 813. The agency agreed that the functions could not be separated and ruled that the sole purpose of the system is to carry pollutants to a receiving body of water and discharge them in a manner that will minimize adverse environmental impacts. *Id.* at 814. On appeal, we examined the supporting evidence, and held that the agency's finding was supported by the record. *Id.*

██ Here, NextEra has claimed the same exemption for the same reasons, and, with regard to the volume of water, the Town of Seabrook has responded in a nearly identical manner. Specifically, the Town asserts that if the water were to be discharged into the Browns River, it would overwhelm the surrounding marsh and beach area, as well as nearby roads, bridges, and other infrastructure. Thus, the Town contends that the purpose of the discharge system is, at least to an extent, to maintain and preserve public infrastructure. According to the Town, this is not a pollution control purpose. This is just another way of saying that damage caused by the discharge of a high volume of water is not damage caused by a pollutant. To the contrary, NextEra provided ample evidence to support a 100% exemption. It explained that the discharge system was designed to treat thermal discharge by transporting the heated water beyond the Hampton Harbor area. Thus, again, we hold that DES did not err in ruling that the discharge system is a pollution control facility entitled to a 100% exemption.

### E. Circulating Water Intake Tunnel

The Town argues that DES erred in ruling that the circulating water intake tunnel is entitled to a 57% exemption. The intake tunnel is used primarily to draw cooling water from the ocean. However, it is periodically used as a discharge tunnel for purposes of biofouling control. NextEra claimed that the Environmental Protection Agency (EPA) required the tunnel to be 7,000 feet long because of environmental concerns associated with the periodic use of the tunnel for discharge. DES agreed, finding that "if not for this period[ic] use, the tunnel could extend 3,000 feet into the ocean; due to US EPA concern over thermal pollution when water is discharged, the tunnel must extend 7,000 feet." Thus, DES ruled that the extended portion of the tunnel is entitled to the exemption — that is, the 4,000 feet that was added to address environmental concerns, or 57% of the total tunnel (4,000/7,000).

██ The Town argues that we should overturn this decision because DES did not have before it any documents from the EPA addressing the

extension of the intake tunnel. However, DES did have before it ample other evidence to support the exemption. NextEra specifically explained that the pollution control function of the circulating water intake tunnel "is to control and reduce the effects of the thermal discharge by transporting the heated steam condenser cooling water beyond the estuarine system to the offshore point of discharge." NextEra also cited supporting documents available at the plant. Furthermore, the outcome here is consistent with our ruling concerning the circulating water discharge tunnel; when the intake tunnel discharges, it is exactly like the discharge tunnel and thus its length likewise minimizes thermal pollution. There is no reason to treat the systems differently when they operate in an identical manner. Accordingly, we uphold DES's decision to grant a 57% exemption to the circulating water intake tunnel.

### F. Storm Water Run-Off and Treatment System

The Town argues that the record does not support DES's decision to grant a 100% exemption for the Plant's storm water run-off and treatment system. We disagree. In *Appeal of Town of Newington*, 149 N.H at 351, we upheld a DES decision to grant a 100% exemption to a storm water management system. We noted that testimony in the record stated that the system was designed to minimize erosion, stabilize embankments, and control runoff, as well as to trap sediment to prevent silt-laden runoff water from entering sensitive environmental areas. *Id.* The Application here similarly asserts that the system is designed to "prevent local flooding of the site area in a controlled manner to prevent erosion," and that "[the system] is necessary to treat yard run-off to remove sediment before discharge from the site." The Application also provides a schematic drawing of the system and cites available supporting documents. Accordingly, DES's decision to grant an exemption to this system was amply supported by the record and we decline to overturn it.

### III. Hearing Requirement

The Town's third argument on appeal is that DES was required to hold a hearing on this matter. RSA 72:12-a proceedings are non-adjudicative. *See* N.H. ADMIN. RULES, Env-C 205.01(c). New Hampshire Administrative Rule, Env-C 205.03(a)(4) provides, among other things, that DES "shall conduct an oral public hearing in a non-adjudicative proceeding . . . [if] the department believes an oral public hearing would be of benefit." The Town does not dispute that this regulation grants DES the discretion to determine whether a hearing is necessary. Nevertheless, the Town argues that RSA 72:12-a required DES to exercise its discretion to

hold a hearing in this case because a hearing was necessary for DES to fulfill its statutory duties. Thus, it essentially argues that the statute itself requires a hearing. We disagree.

We accord statutory language its plain and ordinary meaning, and we will not add words the legislature did not see fit to include. *Appeal of Town of Rindge*, 158 N.H. at 24. RSA 72:12-a, III requires DES to "investigate and determine" whether a facility is eligible for the exemption and, if so, to what extent. It also gives DES wide latitude in choosing its investigatory techniques, and permits, but does not require, DES to "inspect the facility and request such other information from the applicant as is reasonably necessary to assist it in making its determination." RSA 72:12-a, III.

The statute does not, however, explicitly mention hearings, and the statutory text cannot be fairly construed as requiring hearings. First, a hearing requirement cannot be gleaned from the words "investigate and determine." Investigate means "to observe or study closely." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1189 (unabridged ed. 2002). And, "determine" means "to settle a question or controversy." *Id.* at 616. Though a hearing certainly could be helpful to the completion of these tasks, we see no reason why the statutory phrase "investigate and determine" necessarily requires DES to hold a hearing. Second, it would be plainly inconsistent with the statute's broad grant of investigatory discretion to interpret it as containing an atextual mandatory hearing requirement. Had the legislature intended to require hearings, it could have easily done so. Indeed, in other statutes, it has explicitly required hearings. *See, e.g.*, RSA 4:44 (2003) ("Prior to making any judicial appointment with the governor under the provisions of the constitution, the executive council shall hold a public hearing . . . ."); RSA 485-A:22, V-b(e) (2001) ("Before land is taken by eminent domain, the department shall hold a public hearing in the municipality."); RSA 570-A:2, II(k)(2) (Supp. 2011) ("[T]he school board shall hold a public hearing to determine whether audio recording should be authorized in school buses . . . ."). We will not add a requirement the legislature did not see fit to include in the statute's text. *See Appeal of Town of Rindge*, 158 N.H. at 24. Accordingly, we hold that RSA 72:12-a does not require DES to hold a hearing when it is determining whether a facility is entitled to the statutory exemption.

*IV. Res Judicata, Collateral Estoppel, and Finality*

The Town's fourth argument on appeal is that res judicata, collateral estoppel, and finality bar NextEra's application. Its basic argument is that "to the extent NextEra's application requests a change in the tax exemp-

tion status, or amount, from that previously determined in [the 1984 decision], DES should have required NextEra to establish that the changes are not barred by [collateral estoppel, res judicata, or finality]."

■ "[T]he doctrine of collateral estoppel bars a party to a prior action, or a person in privity with such a party[,] from relitigating any issue or fact actually litigated and determined in the prior action." *Gray v. Kelly*, 161 N.H. 160, 164 (2010) (quotation omitted). Similarly, "[r]es judicata . . . bars the relitigation of any issue that was, or might have been, raised in respect to the subject matter of the prior litigation." *Id.* (quotation omitted). Both doctrines must be raised as affirmative defenses. *Id.* Thus, both doctrines operate in an adversarial setting to preclude an adverse party from rearguing certain issues of law or fact.

■ Here, DES's investigative process was non-adjudicative. There were no hearings. The Town was not a named party to the process. Nor did the Town have a right to be a party to the process. *Appeal of Town of Bethlehem*, 154 N.H. at 326-27. Instead, at the administrative level, the Town merely had a right to receive notice and submit comments on the Application pursuant to RSA 541-A:39 (2007) and RSA 72:12-a, II. Furthermore, as we have previously recognized, "[DES is] statutorily authorized to investigate and make a determination *regardless of submissions made by anyone*, including the applicant and the Town." *Appeal of Town of Bethlehem*, 154 N.H. at 330 (emphasis added). Thus, the proceeding has none of the hallmarks of a judicial proceeding. *See Appeal of City of Keene*, 141 N.H. 797, 800 (1997) ("An act is judicial in nature if officials are bound to notify, and hear the parties, and can only decide after weighing and considering such evidence and arguments, as the parties choose to lay before them." (quotation omitted)).

■ In light of the character of DES's investigative process, the doctrines of res judicata and collateral estoppel do not apply. Both doctrines prevent relitigation of issues — here, there was no litigation. Both doctrines must be raised as affirmative defenses — here, there was no party who had a right to raise any defenses. Both doctrines operate in an adversarial setting — here, there was no adversary who had a right to be a party to the process. Simply put, NextEra was merely seeking a determination from DES regarding RSA 72:12-a tax exemptions and DES had no obligation to turn its investigatory process into a full-blown adversarial proceeding in which opposing parties may raise traditional legal defenses. *Appeal of Town of Bethlehem*, 154 N.H. at 326-29. Although we have stated that res judicata and collateral estoppel may preclude the relitigation of issues decided in prior administrative decisions, *see Tyler v.*

*Hannaford Bros.*, 161 N.H. 242, 246 (2010); *Cook v. Sullivan*, 149 N.H. 774, 777-78 (2003), these doctrines cannot operate in RSA 72:12-a determinations because the process used has a uniquely non-adjudicative character.

 As to the Town's reliance on administrative finality, we note that doctrine "provides for a qualified and limited preclusion, wherein a second application for [a] substantially similar outcome from an administrative agency is barred unless the applicant can demonstrate a change in material circumstances between the two applications." *Johnston v. Ambulatory Surg. Assoc. v. Nolan*, 755 A.2d 799, 809 (R.I. 2000). We have not adopted this doctrine in the context of DES tax exemption investigations, but we have applied a similar doctrine in the context of zoning board of appeal decisions. *See Appeal of Parkland Med. Ctr.*, 158 N.H. 67, 71 (2008). Assuming the doctrine does apply here, the Town's argument nonetheless fails. There have been material changes since the prior application and the statute itself has been modified. *Cf. Brandt Dev. Co. v. City of Somersworth*, 162 N.H. 553 (2011). Accordingly, NextEra's application would not be barred by administrative finality, and thus we need not determine whether administrative finality applies to DES decisions under RSA 72:12-a.

*V. Adjudicative Process*

 The Town's final argument on appeal is that DES's adoption and application of rules providing for a non-adjudicative determination of RSA 72:12-a tax exemptions was *ultra vires*. This argument is foreclosed by our decision in *Appeal of Town of Bethlehem*, 154 N.H. at 326-29, in which we held that towns affected by RSA 72:12-a tax exemptions have no right to formal adjudicative proceedings under the Administrative Procedure Act, RSA 72:12-a, DES's administrative rules, or our State Constitution. We repeat what we previously said: "If the legislature desired to permit a municipality which opposed a tax exemption application the opportunity for a formal hearing and to become a party to an adversarial-type proceeding, it could easily have done so. It did not." *Appeal of Town of Bethlehem*, 154 N.H. at 326.

> *Affirmed in part and reversed in part.*

DALIANIS, C.J., and CONBOY and LYNN, JJ., concurred.