NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Bureau of Securities Regulation
No. 2012-729

APPEAL OF THE LOCAL GOVERNMENT CENTER, INC. & a.

Argued: November 14, 2013
Opinion Issued: January 10, 2014

Ann M. Rice, deputy attorney general (Suzanne M. Gorman, senior assistant attorney general, on the brief), and Bernstein, Shur, Sawyer, & Nelson, P.A., of Manchester (Andru H. Volinsky, Roy W. Tilsley, Jr., and Christopher G. Aslin on the brief, and Mr. Volinsky orally), for the petitioner.

Preti Flaherty, PLLP, of Concord (William C. Saturley and Brian M. Quirk on the brief, and Mr. Saturley orally), David I. Frydman, of Concord, on the brief, and Ramsdell Law Firm, PLLC, of Concord (Michael D. Ramsdell on the brief), for the respondents.

Howard & Ruoff, P.L.L.C., of Manchester (Mark E. Howard on the brief), for Harold J. Pumford, as amicus curiae.

LYNN, J. The respondents, The Local Government Center, Inc. (LGC), Local Government Center Real Estate, Inc., Local Government Center Health

Trust, LLC, Local Government Center Property-Liability Trust, LLC, Health Trust, Inc., New Hampshire Municipal Association Property-Liability Trust, Inc., LGC-HT, LLC, and Local Government Center Workers' Compensation Trust, LLC,[1] appeal a final order of a presiding officer of the petitioner, the New Hampshire Bureau of Securities Regulation (Bureau), finding that they violated RSA 5-B:5, I(c) (2013) and requiring, among other things, HealthTrust to return $33.2 million to its members, P-L Trust to return $3.1 million to its members, and P-L Trust to transfer $17.1 million to HealthTrust.[2] We affirm in part, vacate in part, and remand.

I. Background

A. LGC and Related Entities

The following facts are derived from the presiding officer's report or the certified record, or they are undisputed. LGC is the successor to the New Hampshire Municipal Association, Inc. (NHMA), which was a non-profit New Hampshire corporation that provided lobbying, legal counsel and training for its members (comprised of various municipalities) and administrative support to certain affiliated associations. HealthTrust is the successor to NHMA Health Insurance Trust, which NHMA created in 1985, and P-L Trust is the successor to NHMA Property Liability Trust, which NHMA created in 1986. Workers' Compensation Trust is the successor to a similar program created by NHMA. When it was first established, it was "housed" in NHMA Property Liability Trust. It became a separate trust in 2000.

HealthTrust, P-L Trust, and Workers' Compensation Trust are pooled risk management programs. See RSA ch. 5-B (2013). HealthTrust is the largest pooled risk management program operated by LGC. As of December 31, 2010, HealthTrust had revenues of $392,244,000, P-L Trust had revenues of $10,254,000, and Workers' Compensation Trust had revenues of $6,517,000. According to the respondents, HealthTrust provides health insurance benefits to "more than 70,000 individual public employees, their dependents, and retirees, with 36 medical plans and 25 prescription drug plans. HealthTrust handles approximately $360 million in claims each year." According to the respondents, P-L Trust provides property liability insurance that "covers over 4,000 buildings and their contents with a value of nearly four billion dollars in

---

[1] For the purposes of this appeal, we refer to the entities with "Health Trust" in their names, collectively, as "HealthTrust," the entities with "Property Liability Trust" in their names, collectively, as "P-L Trust," and any entity with "Workers' Compensation Trust" in its name as "Workers' Compensation Trust."

[2] See RSA 5-B:4-a (2013) (regarding hearings for violations of RSA chapter 5-B and providing for appeals to this court); RSA 421-B:2, XVI-b (2006) (defining "presiding officer" as person to whom secretary of state has delegated authority to preside over administrative hearing), :26-a (2006) (governing how such hearings must be conducted).

its Property-Liability risk pool, and also covers 26,000 public employees in its Workers' Compensation risk pool."

Pooled risk management programs are alternatives to traditional, single employer insurance programs. A pooled risk management program allows political subdivisions such as cities, counties, and school districts, to combine or "pool" so that they are considered as one customer for purposes of insurance coverage and risk management. As the presiding officer found, "The steps involved in the acquisition of insurance coverage by a political subdivision from, for instance, . . . [H]ealth [T]rust[,] would appear quite basic." Political subdivisions apply to be members of a pooled risk management program. Information about the group of individuals to be insured is then submitted for evaluation and rating. Upon approval of the requested insurance coverage for the coverage year, the political subdivision is assigned a premium rate and assigned to either a January or a July pool of program members, depending upon the political subdivision's fiscal year or requested coverage year. LGC then collects the premiums, and a third party administrator, such as Anthem Blue Cross/Blue Shield, handles any claims.

Generally, HealthTrust, P-L Trust, and Workers' Compensation Trust operate similarly to a mutual insurance company with the net assets of each program considered the property of its respective members. Earnings and surplus of each trust are determined annually at the end of the coverage year by subtracting certain expenditures from the program's total revenue (consisting of income from investments and combined premiums paid by the program's members). The year-end statements for years 2008 through 2010 report that HealthTrust had net assets of $92,687,000 in 2008, $79,481,000 in 2009, and $86,782,000 in 2010. P-L Trust had net assets of $10,093,000 in 2008, $10,838,000 in 2009, and $10,225,000 in 2010. The Workers' Compensation Trust had net assets of $829,000 in 2008, a negative net asset level expressed as ($992,000) in 2009, and net assets of $177,000 in 2010.

Until 2003, HealthTrust, P-L Trust, and Workers' Compensation Trust operated as organizations separate from each other and from LGC. Each organization – HealthTrust, P-L Trust, Workers' Compensation Trust, and LGC – had its own corporate by-laws and its own board of directors. In addition, the members of each organization were not identical; thus, for example, a political subdivision that was a member of HealthTrust was not necessarily also a member of P-L Trust.[3] In 2003, LGC took control of the assets of HealthTrust, P-L Trust, and Workers' Compensation Trust. Sometime thereafter, LGC eliminated the separate boards that previously had governed those entities. After 2003, a single board of directors governed LGC, HealthTrust, P-L Trust,

---

[3] At oral argument, counsel for the Bureau represented that as many as two-thirds of the members of HealthTrust were not also members of Workers' Compensation Trust.

and Workers' Compensation Trust.  See Prof'l Firefighters of N.H. v. Local Gov't Ctr., 159 N.H. 699, 701 (2010).  In effect, after the 2003 reorganization, LGC became the "parent" to its "subsidiaries," HealthTrust, P-L Trust, and Workers' Compensation Trust.  See id.  In 2007, LGC merged Workers' Compensation Trust with P-L Trust.

Historically, Workers' Compensation Trust has collected insufficient insurance premiums to cover its costs.  To remedy this problem, beginning with the 2003 reorganization, LGC transferred funds from HealthTrust and P-L Trust to Workers' Compensation Trust.  Between 2003 and 2010, LGC transferred approximately $18.3 million from HealthTrust to Workers' Compensation Trust.  After the Bureau investigated this practice, the LGC board voted to execute a promissory note for approximately $17.1 million payable to HealthTrust, although the board made the note interest-free.

B.  RSA chapter 5-B

Until the legislature enacted RSA chapter 5-B in 1987, there were no specific laws addressing pooled risk management programs operated by non-profit organizations.  The stated purpose of RSA chapter 5-B "is to provide for the establishment of pooled risk management programs and to affirm the status of such programs established for the benefit of political subdivisions of the state."  RSA 5-B:1.  In its declaration of purpose, the legislature stated that "pooled risk management is an essential government function" that provides "focused public sector loss prevention programs, accrual of interest and dividend earnings which may be returned to the public benefit and establishment of costs predicated solely on the actual experience of political subdivisions in the state."  Id.  Pursuant to RSA chapter 5-B, "pooled risk management programs which meet the standards established" by that chapter are "not subject to insurance regulation and taxation by the state."  Id.; see RSA 5-B:6.

From its inception, RSA chapter 5-B has required pooled risk management programs to file certain information with the secretary of state's office.  RSA 5-B:4.  However, it was not until 2010 that the legislature vested that office with the authority to enforce RSA chapter 5-B by bringing administrative actions and imposing penalties for violations of its provisions.  See Laws 2010, 149:3 (codified as RSA 5-B:4-a).  RSA 5-B:5, I, sets forth the following standards that pooled risk management programs must meet to comply with RSA chapter 5-B:

Each pooled risk management program shall meet the following standards of organization and operation.  Each program shall:

4

(a) Exist as a legal entity organized under New Hampshire law.

(b) Be governed by a board the majority of which is composed of elected or appointed public officials, officers, or employees. Board members shall not receive compensation but may be reimbursed for mileage and other reasonable expenses.

(c) Return all earnings and surplus in excess of any amounts required for administration, claims, reserves, and purchase of excess insurance to the participating political subdivisions.

(d) Provide for an annual audit of financial transactions by an independent certified public accountant. The audit shall be filed with the department and distributed to participants of each pooled risk management program.

(e) Be governed by written bylaws which shall detail the terms of eligibility for participation by political subdivisions, the governance of the program and other matters necessary to the program's operation. Bylaws and any subsequent amendments shall be filed with the department.

(f) Provide for an annual actuarial evaluation of the pooled risk management program. The evaluation shall assess the adequacy of contributions required to fund any such program and the reserves necessary to be maintained to meet expenses of all incurred and incurred but not reported claims and other projected needs of the plan. The annual actuarial evaluation shall be performed by a member of the American Academy of Actuaries qualified in the coverage area being evaluated, shall be filed with the department, and shall be distributed to participants of each pooled risk management program.

(g) Provide notice to all participants of and conduct 2 public hearings for the purpose of advising of potential rate increases, the reasons for projected rate increases, and to solicit comments from members regarding the return of surplus, at least 10 days prior to rate setting for each calendar year.

(Emphasis added.)

C. Procedural History

The underlying matter arises from a petition submitted and later amended by Bureau staff alleging that the respondents violated both RSA chapter 5-B and RSA chapter 421-B.  On September 2, 2011, the secretary of state issued an order commencing an adjudicative proceeding and appointed a presiding officer for that proceeding.  See RSA 421-B:26-a, V (2006).  From September 2, 2011, through April 30, 2012, the presiding officer issued approximately fifty prehearing and preliminary orders addressing various topics.  The final evidentiary hearing was conducted from April 30, 2012, to May 11, 2012.  The presiding officer issued an eighty-one page narrative order on August 16, 2012.  Because the presiding officer dismissed the claims under RSA chapter 421-B, those claims are not at issue in this appeal.  Although the respondents were found to have violated three provisions of RSA 5-B:5, I, see RSA 5-B:5, I(b), (c), (e), they have appealed only the finding that they failed to return "all earnings and surplus in excess of any amounts required for administration, claims, reserves, and purchase of excess insurance to the participating political subdivisions."  RSA 5-B:5, I(c).  Nonetheless, we reference other findings of the presiding officer where necessary to provide context for our discussion.

### 1.  Findings Regarding Organizational Structure

The presiding officer first found that the respondents violated RSA 5-B:5, I(b) and (e).  He construed those provisions to require that each pooled risk management program be governed by its own board of directors and by its own bylaws.  See RSA 5-B:5, I (b), (e).  Accordingly, he found that the 2003 reorganization, which resulted in LGC transferring the assets of its pooled risk management programs to itself and abolishing the separate boards that had previously governed such programs, violated those provisions.

The presiding officer explained that "[b]y abolishing each program's respective board and substituting the LGC . . . board of directors, the political subdivision members of each pooled risk management program were deprived of the governance previously maintained for their benefit," as required by statute.  The post-2003 reorganization "result[ed] in a conglomerate imbued with conflicts of interest adverse to the required standards for operation of each pooled risk management program."  "The influences and interests that would be limited to considerations of a single program and its members [became] subject to other influences and interests within the LGC . . . conglomerate related to other subsidiary business entities all governed by the one board."  Inasmuch as the respondents have not appealed the above-described portions of the presiding officer's decision, we assume, without deciding, that they were correctly decided.

### 2.  Findings Regarding Return of Excess

6

The presiding officer next found that the respondents violated RSA 5-B:5, I(c) because they failed to "[r]eturn all earnings and surplus in excess of any amounts required for administration, claims, reserves, and purchase of excess insurance to the participating political subdivisions." The presiding officer described the requirements of RSA 5-B:5, I(c) as a formula: "Earnings + Surplus – (costs of administration + costs of claims + reserves + cost of reinsurance) = Amount returned to member political subdivisions." He interpreted RSA 5-B:5, I(c) to require a pooled risk management program to return to its members "any amount of earnings and surplus . . . that exceeds the amounts required for 'administration, claims, reserves, and purchase of excess insurance.'" The presiding officer found that the post-2003 "parent/subsidiary" organizational structure of the respondents contributed to the violations of RSA 5-B:5, I(c). He concluded that the respondents violated RSA 5-B:5, I(c) by: (1) retaining more funds than were required for "administration, claims, reserves, and purchase of excess insurance"; (2) using the excess funds for purposes unrelated to "administration, claims, reserves, and purchase of excess insurance"; and (3) failing to return the excess funds to the political subdivision members.

### a. Retention of Funds

The presiding officer found that the respondents used the risk-based capital (RBC) method to compute the amount of funds they should retain to pay for "administration, claims, reserves, and purchase of excess insurance." RSA 5-B:5, I(c). The RBC method was developed by the National Association of Insurance Commissioners in conjunction with the American Academy of Actuaries and is used by most state insurance regulators, including New Hampshire, to measure the solvency of insurance entities. The RBC method quantifies an insurer's reserve strength as the ratio of assets to a risk measure known as the "Authorized Control Level" or "ACL." The ACL is determined by a complex formula, based upon an insurer's product mix, provider arrangements, reinsurance arrangements, and types of assets. The ACL is intended to reflect the insurer's exposure to all types of risks. To calculate the RBC ratio, the insurer's total adjusted capital is divided by the ACL. See RSA 404-F:1, XIII(a) (2006) (defining "total adjusted capital" as "[a]n insurer's statutory capital and surplus as determined in accordance with statutory accounting applicable to the annual financial statements required to be filed").[4] For example, as of March 2010, HealthTrust's total adjusted capital was $71.3

---

[4] We recognize that the respondents are not regulated by the insurance department and are not subject to RSA chapter 404-F and related statutory provisions governing insurance companies. See RSA 5-B:1 ("[P]ooled risk management programs which meet the standards established by [RSA chapter 5-B] should not be subject to insurance regulation and taxation by the state."). We cite provisions within RSA chapter 404-F solely to help the reader understand the concept of RBC ratios.

million.  Its ACL was $16.5 million.  Its RBC ratio was 4.3 (71.3 divided by 16.5).

In essence, the ACL is a hypothetical minimum level of capital.  The RBC ratio compares the insurer's actual capital level to the hypothetical minimum level.  When an insurer's RBC ratio falls below 2.0, the insurer is subject to certain regulatory interventions by the insurance department.  See RSA 404-F:1, X, :4-:6 (2006).  If an insurer has an RBC ratio below .7, the insurance department must take control of the insurer.  See RSA 404-F:1, X(d), :6, II.

The presiding officer found that, since the 2003 reorganization, the respondents have set a desired "target" level of retained capital, expressed as an RBC ratio.  Since 2003, the target for HealthTrust has been an RBC ratio of between 4.2 and 4.75.  The presiding officer found that although the LGC board purported to use the RBC method to set the target, in fact, it did not do so.  Rather, the board arbitrarily "set [the target] at RBC 4.2, approximately twice the previous year's net assets."  Additionally, the LGC board decided "to arbitrarily bump" the target RBC ratio "by an additional factor of approximately . . . 0.5 for future expenses."  The presiding officer explained:  "The RBC ratio is supposed to be the result of a risk based analytical formula.  An after-the-fact bump of an arbitrary sum the board referred to as RBC 0.5 is an erroneous use of an RBC ratio and is an improper inflation of even its own target RBC 4.2 to cover what in most entities are planned budgeted expenditures."  In this way, the target RBC ratio was not a "pure RBC ratio," but was "an RBC ratio that would support [the board's] rationale for accumulating an excessive amount of assets."

The presiding officer further found that the respondents regularly exceeded the self-imposed target RBC ratio.  For instance, although the target RBC ratio was 4.2, in 2005, HealthTrust's actual RBC ratio was 4.5; in 2006, its actual RBC ratio was 6.0; and in 2007, its actual RBC ratio was 6.7.  Additionally, the presiding officer found that the LGC board "arbitrar[ily] assign[ed] risk percentages," which affected the RBC ratios.  Thus, he concluded that the respondents accumulated and retained more funds than were required for "administration, claims, reserves, and purchase of excess insurance."  RSA 5-B:5, I(c).

The presiding officer found that, since the 2003 reorganization, HealthTrust's net assets increased from $23.9 million in 2003 to $86.8 million in 2010.  He found that HealthTrust "built up its net assets to such a high level that in 2010 it abandoned the practice of purchasing either individual claim or aggregate reinsurance to cover an extraordinarily large individual claim loss or [an] extraordinarily large combined number of individual claims."  The presiding officer observed that the kinds of catastrophes for which HealthTrust was preparing to be responsible "rang[ed] from a World War I type pandemic,

8

where 700,000 people died in this country, to a Seabrook Nuclear Power Plant failure." He concluded that the fact that HealthTrust was preparing for events of this magnitude "evidence[d] [its] desire and practice . . . to retain a substantially higher level of reserves than otherwise would be necessary with reinsurance in place." He explained that "[s]ubstituting the higher retention of earnings and surplus to build sufficient reserves to handle whatever comes our way, instead of the purchase of reinsurance clearly inflates a reasonable and necessary level of reserves or net assets and is a violation of RSA 5-B:5, I(c)." As he stated: "The manner by which the LGC, Inc.-controlled health trust addressed the issue of reinsurance is an example of its operative disregard of the purpose and standards of RSA [chapter] 5-B."

### b. Use of Funds

The presiding officer found that after the 2003 reorganization, approximately $18.3 million was transferred from HealthTrust to LGC to subsidize Workers' Compensation Trust. A lesser amount was transferred from P-L Trust to LGC for the same purpose. According to the presiding officer, "[t]hese periodic transfers out of the health and property liability accounts to subsidize another program were done in violation of a specific inter-entity loan policy that . . . govern[ed] transfers within the LGC and its entities." The presiding officer found that LGC's manner of reporting the transfers as "contributions to parent" on the financial statements of HealthTrust and P-L Trust made it difficult to discern that the money was, in fact, being used to subsidize Workers' Compensation Trust. He found that amounts transferred to Workers' Compensation Trust did not "reasonably qualify as costs and reserves permitted to be retained by the statute," and, therefore, were required to have been returned to political subdivision members.

### c. Return of Funds

The presiding officer found that the respondents did not return the accumulated funds that were in excess of the target RBC ratio. The presiding officer explained that the respondents reported the funds that met the target RBC ratio in a line item entitled "board designated" and that they reported funds that were in excess of the target RBC ratio in a line item entitled "undesignated." The following chart shows the amount of funds that were in the undesignated line item for HealthTrust for the years 2003 to 2008:

9

| Year | Amount in Undesignated Line Item |
|------|----------------------------------|
| 2003 | $23,944,000 |
| 2004 | $24,873,000 |
| 2005 | $56,303,000 |
| 2006 | $16,248,000 |
| 2007 | $25,047,000 |
| 2008 | $25,723,000 |

The presiding officer found that the amounts that were reported as "undesignated" should have been, but were not, returned to political subdivision members.

The presiding officer also found that in 2009, LGC "essentially depleted" the undesignated line item "account," in part, by using those funds "to fund what [LGC] reported as additional claims losses . . . of [approximately] $8.8 million" and by "transferring approximately $4.4 million [from HealthTrust] to . . . LGC." The presiding officer further found "that the essential elimination of the funds that ordinarily would have been assigned to [the undesignated line item] was accomplished by an inexplicable increase within that year's calculation of risk factors by the LGC . . . actuary or staff."

3. Remedy

To remedy the violations of RSA 5-B:5, I(b) and (e), the presiding officer ordered LGC to organize HealthTrust and P-L Trust "into a form that provides each program with an independent board and its own set of written bylaws." The respondents complied with this portion of the presiding officer's decision in the fall of 2013.

To remedy the violation of RSA 5-B:5, I(c), the presiding officer ordered HealthTrust and P-L Trust to return excess funds from 2010 to their respective political subdivision members by September 1, 2013. The presiding officer calculated the excess funds held by HealthTrust for 2010 by limiting it "to a reserve, in addition to its costs of administration and claims, equal to 15% of claims." Thus, the presiding officer found that of the $86,781,781 HealthTrust held in net assets in 2010, $33,200,000 constituted excess funds that must be returned to political subdivision members. The presiding officer ordered that the return of the $33.2 million "shall not be affected by the cost of returning to the practice of purchasing reinsurance by . . . Health Trust which practice is so ordered immediately."

To calculate the excess funds held by P-L Trust, the presiding officer relied upon the testimony of LGC's chief financial officer that, as of 2010, P-L Trust held approximately $3.1 million in excess funds. The presiding officer

10

ordered P-L Trust (of which Workers' Compensation Trust is now a part) to satisfy the previously executed promissory note, by December 1, 2013, by transferring $17.1 million to HealthTrust, as repayment for the subsidy HealthTrust provided Workers' Compensation Trust over the years. The presiding officer ordered that the funds received by HealthTrust in repayment of the subsidy, "to the extent they constitute amounts in excess of the earnings and surplus of the . . . HealthTrust risk pool management program . . . shall be returned to [HealthTrust's] members." The presiding officer specified that "[t]he funds to make this re-payment may be borrowed from an independent entity at commercially reasonable terms."

The presiding officer also ordered prospective relief related to the amount of funds that the respondents may retain in the future for "administration, claims, reserves, and purchase of excess insurance." RSA 5-B:5, I(c). Specifically, he ordered that, in future years, HealthTrust may retain only a "reasonable amount of earnings and surplus," which he defined as "the equivalent of fifteen percent (15%) of claims or an RBC 3.0 as determined by the [Bureau], whichever is less." He required P-L Trust to use a "generally accepted actuarial analysis," approved by the Bureau, to determine P-L Trust's "required net assets." Additionally, the presiding officer required both HealthTrust and P-L Trust to return excess funds to their respective members annually "in the form of cash, dividends or similar cash equivalents." He further ruled that LGC, HealthTrust, and P-L Trust were "jointly and severally liable for the costs in the investigation of this matter, and all related proceedings, including reasonable attorney fees, pursuant to RSA 5-B:4-a, V and are ordered to pay same."

The presiding officer denied the respondents' subsequent motion for rehearing. This appeal followed. While this appeal was pending, the respondents requested that we stay various portions of the presiding officer's order. We stayed only the requirement that P-L Trust transfer $17.1 million to HealthTrust.

## II. Discussion

We will not set aside the presiding officer's decision except for errors of law, unless we are satisfied, by a clear preponderance of the evidence, that such order is unjust or unreasonable. See Appeal of Basani, 149 N.H. 259, 261 (2003). The presiding officer's findings of fact are deemed prima facie lawful and reasonable. Id.; see RSA 541:13 (2007); RSA 5-B:4-a, VIII.

The respondents first challenge the presiding officer's findings that they violated RSA 5-B:5, I(c) by: (1) retaining more funds than were necessary for "administration, claims, reserves, and purchase of excess insurance"; (2) using excess funds for purposes unrelated to "administration, claims, reserves, and

purchase of excess insurance"; and (3) failing to return such funds to political subdivision members. They next challenge the presiding officer's order requiring: (1) HealthTrust to maintain only a "reasonable amount of earnings and surplus," defined as "the equivalent of fifteen percent (15%) of claims or an RBC of 3.0 as determined by the [Bureau]"; (2) HealthTrust to return $33.2 million to its members; (3) HealthTrust to purchase reinsurance; and (4) P-L Trust to repay $17.1 million to HealthTrust. They also contend that the presiding officer erred by failing to recuse himself. Finally, they argue that the presiding officer's award of attorney's fees and costs was improper. We address each of the respondents' arguments in turn.

Resolving many of these issues requires us to engage in statutory interpretation. State Employees' Assoc. of N.H. v. State of N.H., 161 N.H. 730, 738 (2011). Statutory interpretation is a question of law, which we review de novo. Id. In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole. Id. We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id. We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result. Id. Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole. Id. This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme. Id. at 738-39.

A. Violations of RSA 5-B:5, I(c)

1. Improper Retention of Funds

a. Level of Reserves

The respondents argue that RSA 5-B:5, I(c) "leaves the setting of reserve levels to the business judgment of a risk pool's board of directors." Accordingly, they contend, the presiding officer violated the statute, the "business judgment rule,"[5] and their right to "due process and fair notice"

---

[5] "The business judgment rule is a common-law standard of judicial review designed to protect the wide latitude conferred on a board of directors in handling the affairs of the corporate enterprise." 3A W. Fletcher, Fletcher Cyclopedia of the Law of Corporations § 1036, at 42-43 (perm. ed. rev. vol. 2011). "The rule refers to the judicial policy of deferring to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions. . . .[T]he . . . rule . . . establishes a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company. . . . The rule not only protects the decision makers from liability, but also protects the decision itself." Id. at 43, 45, 47. In New Hampshire, the "business

when he found that they had accumulated more funds than were required for "administration, claims, reserves, and purchase of excess insurance." RSA 5-B:5, I(c). They also argue that, to the extent that the presiding officer faulted them for failing to retain a specific level of reserves (e.g., an RBC ratio of 3.0), he exceeded his administrative authority. Further, they argue, the enforcement action itself violated their due process rights because it resulted in "ad hoc rulemaking."

All of these arguments proceed from the same assumption - that RSA 5-B:5, I(c) confers upon the board of directors of a pooled risk management program the unfettered discretion to determine the amount of funds such a program may retain. This assumption is mistaken. RSA 5-B:5, I(c) provides explicit guidance to a pooled risk management program's board of directors regarding the amount of funds such a program may retain. The statutory scheme simply does not support the respondents' claim for unregulated authority.

As the presiding officer noted, RSA 5-B:5, I(c) sets forth a formula: "Earnings + Surplus – (costs of administration + costs of claims + reserves + cost of reinsurance) = Amount returned to member political subdivisions." Pursuant to the plain meaning of the statute, a pooled risk management program may retain only those amounts that are "required for administration, claims, reserves, and purchase of excess insurance." RSA 5-B:5, I(c). All other amounts must be returned to the program's political subdivision members. See id. RSA chapter 5-B further circumscribes the exercise of discretion by a pooled risk management program's board of directors by authorizing the secretary of state to bring enforcement actions against programs that violate statutory mandates. See RSA 5-B:4-a.

### b. Reinsurance

The respondents contend that the presiding officer erroneously ruled that the 2010 decision to cease purchasing individual claim or aggregate claims reinsurance for HealthTrust violated RSA 5-B:5, I(c). We conclude that the presiding officer did not err when he ruled that HealthTrust violated RSA chapter 5-B by deciding not to purchase reinsurance and choosing, instead, to increase its net assets to, in his words, "take on the sole and complete responsibility for meeting catastrophes that would result in extraordinarily large claims loss."

RSA 5-B:5, I(c) allows a pooled risk management program to retain only those amounts that are "required for administration, claims, reserves, and

---

judgment rule" is codified at RSA 293-A:8.30(d) (2010) (amended 2013) ("A director is not liable for any action taken as a director, or any failure to take any action, if he performed the duties of his office in compliance with this section.").

purchase of excess insurance." RSA 5-B:5, I(c). All other funds <u>must</u> be returned to the program's political subdivision members. <u>See</u> <u>id</u>. Allowing such a program to amass extraordinary levels of reserves to self-insure against catastrophic losses is antithetical to that purpose. It is also contrary to the stated purpose of pooled risk management programs, which is to "benefit" the political subdivision members of such programs. RSA 5-B:1.

HealthTrust's 2010 decision to cease purchasing reinsurance must be viewed in the context of its practice of retaining capital to meet an arbitrarily selected target RBC ratio and retaining excess funds instead of returning those funds to members. Under these circumstances, we cannot conclude that the presiding officer erred in finding that HealthTrust violated RSA chapter 5-B by deciding not to purchase reinsurance, but instead to accumulate assets to self-insure against catastrophic claims.

### 2. Improper Expenditure of Excess Funds

#### a. Subsidizing Workers' Compensation Trust

The respondents assert that the presiding officer erroneously found that they violated RSA 5-B:5, I(c) by transferring funds from HealthTrust and P-L Trust to Workers' Compensation Trust after the 2003 reorganization. Relying upon RSA 5-B:3, they contend that RSA chapter 5-B allows one pooled risk management program to subsidize another such program.

RSA 5-B:3, I, authorizes "2 or more political subdivisions" to "form an association . . . to develop and administer a risk management program having as its purposes reducing the risks of its members; safety engineering; distributing, sharing, and pooling risks; acquiring insurance, excess loss insurance, or reinsurance; and processing, paying and defending claims against the members of such association." RSA 5-B:3, III provides that "[p]ooled risk management programs established for the benefit of political subdivisions may provide" various kinds of insurance coverage, including coverage for workers' compensation claims.

RSA 5-B:3 does not sanction what the presiding officer found occurred here. Here, three pooled risk management programs shared a <u>single</u> board of directors, even though RSA 5-B:5, I(b) requires each program to have its own board. Two of those programs then transferred funds to the third program, despite the fact that the three programs had different members. Thus, funds that otherwise would have been returned to some political subdivision members were instead used to subsidize a pooled risk management program that benefitted <u>other</u> political subdivisions. Under those circumstances, we cannot conclude that the presiding officer's finding that the post-2003 transfers from HealthTrust and P-L Trust to Worker's Compensation Trust

14

violated RSA chapter 5-B was unlawful, unjust, or unreasonable.  See Appeal of Basani, 149 N.H. at 261.

### b.  Other Expenditures

The respondents argue that the presiding officer improperly considered the decision of the LGC board to offer a fixed benefit retirement plan to its employees.  The respondents argue that the "Presiding Officer erred when he failed to defer to the business judgment of LGC's Board of Directors that the retirement plan was required for administration of its risk pools."  Given that the presiding officer did not rule that the plan was unlawful and did not order it dismantled, we decline to hold that he erred by considering its existence.  See id.

### 3.  Return of Excess Funds

The respondents argue that the presiding officer erroneously found that they failed to return excess funds to their political subdivision members, as required by RSA 5-B:5, I(c).  They assert that because they returned excess funds to their respective members "via rate stabilization," and because RSA 5-B:5, I(c) does not specify that excess funds must be returned in cash or cash equivalents, the presiding officer erred when he found that returning excess funds "via rate stabilization" violated the statute.  They also argue that he erred by directing them to return such funds to their members in cash, dividends, or their equivalents in the future.

The respondents do not define "rate stabilization" in their brief.  However, the presiding officer gave the following description of the practice, which the testimony of the former executive director of LGC and its current chief financial director supports and which we adopt:  "[A] rate credit . . . is . . . analogous to a rebate for future participating years. . . .  Consequently, when employing the rate crediting process, surplus is not credited just for the following year, but over multiple years into the future for those political subdivisions that choose to acquire insurance through LGC, Inc. for that extended period."

RSA 5-B:5, I(c) commands a pooled risk management program to "[r]eturn all earnings and surplus in excess of any amounts required for administration, claims, reserves, and purchase of excess insurance to the participating political subdivisions."  In this context, "[e]arnings" are "the balance of revenue for a specific period that remains after deducting related costs and expenses incurred."  Webster's Third New International Dictionary 714 (unabridged ed. 2002).  In RSA 5-B:5, I(c), the "related costs and expenses incurred" are "any amounts required for administration, claims, reserves, and purchase of excess insurance."  The word "surplus" similarly refers to "the amount that remains when use or need is satisfied," or "an excess of receipts

15

over disbursements." Id. at 2301. "[M]ore than or above the usual or specified amount . . . constitutes an excess." Id. at 792. To "return" in this context is to "give back" the "earnings and surplus" to participating political subdivisions. Id. at 1941. Therefore, pursuant to its plain meaning, RSA 5-B:5, I(c) directs a pooled risk management program to give back to participating political subdivisions the amount of money that remains after deducting from the pooled risk management program's total revenue those amounts "required for administration, claims, reserves, and purchase of excess insurance."

In arguing for a different interpretation, the respondents rely upon RSA 5-B:5, I(g), which requires a pooled risk management program to, among other things, "solicit comments from members regarding the return of surplus, at least 10 days prior to rate setting for each calendar year." They infer that RSA 5-B:5, I(g), by referring to "return of surplus" in the same sentence as "rate setting," authorized them to return surplus "over multiple years via rate reduction." We disagree. In context, the phrase "10 days prior to rate setting for each calendar year" merely describes the time within which a pooled risk management program must consult with its members about the return of surplus. That phrase does not alter the mandate of RSA 5-B:5, I(c).

The respondents also observe that the "clear preference" of their "members has been for rate stabilization, not cash refunds," and that "rate stabilization" is "consistent with risk pool practices around the country." Those considerations, however, do not affect the plain meaning of RSA 5-B:5, I(c). As then-Senator Hassan explained in 2010 at a public hearing on the legislation that, when passed, vested the secretary of state with the authority to enforce RSA chapter 5-B:

> The issue here is not whether [rate reduction] is a good way to run an insurance pool or not, or what shared risk, the concept of shared risk within an insurance pool. The issue is the plain language of the statute says that, if you have a surplus, it is supposed to go back to the political subdivisions. It doesn't say you can reduce rates over time, and some members win and some members lose, or some subdivisions win and some subdivisions lose . . . .[6]

In light of our construction of RSA 5-B:5, I(c), we find no error in the presiding officer's determination that the respondents violated RSA 5-B:5, I(c) when they purported to return "all earnings and surplus" to their political subdivision members "via rate stabilization," instead of in cash or cash equivalents. We

---

[6] See Relative to the Treatment of New Hampshire Investment Trusts and Relative to Pooled Risk Management Programs: Hearing on H.B. 1393 Before the Senate Comm. on Commerce, Labor and Consumer Protection, 93-94 (May 4, 2010) (statement of Senator Margaret Wood Hassan, Member, Senate Comm. on Commerce, Labor and Consumer Protection).

also find no error in the presiding officer's directive that, in the future, the respondents shall return "all earnings and surplus" to their political subdivision members in "cash, dividends or similar cash equivalents."

### B. Prospective Relief

#### 1. Setting Future RBC Ratio

The respondents contend that the presiding officer erred when he mandated that HealthTrust, in the future, absent regulatory or legislative action, maintain net assets equivalent to fifteen percent of claims or an RBC ratio of 3.0. We agree that, in so ruling, the presiding officer exceeded his authority. "An agency may not add to, change, or modify the statute by regulation or through case-by-case adjudication." In re Jack O'Lantern, Inc., 118 N.H. 445, 448 (1978); see also Appeal of Monsieur Henri Wines, Ltd., 128 N.H. 191, 194 (1986). By imposing a requirement that HealthTrust maintain as reserves a specific level of net assets equivalent to fifteen percent of claims or an RBC ratio of 3.0, the presiding officer impermissibly modified RSA 5-B:5, I(c), which does not require either a particular level of reserves or a particular methodology for calculating reserves. Therefore, we vacate this portion of the presiding officer's order. As we explained previously, we do not vacate the requirement that HealthTrust (and the other pooled risk trusts) establish necessary reserves in accordance with an actuarially sound methodology and that it return amounts in excess of the amount needed for administration, claims, reserves and reinsurance in "cash, dividends or similar cash equivalents" to its political subdivision members.

#### 2. Return of $33.2 Million

The respondents contend that "[i]n ordering HealthTrust to return $33.2 million in reserves, the Presiding Officer included $2,237,390 'invested in capital assets.'" They argue that "[t]he evidence at the hearing was that in evaluating reserve levels for insurance-like entities, 'non-admitted' assets – assets that would not be available to pay claims, such as 'furniture and equipment, software development costs, most deferred income tax assets, and certain equity investments' – should not be considered." The only support they provide for their argument is a single page from a May 2010 study of the reserves and surpluses held by Massachusetts insurers, which merely states: "[I]t is important to recognize that, in the event of a significant call on company financial resources, the value represented by these assets may not be available or be available at a fraction of the non-admitted amount." Mass. Div. of Health Care Fin. & Policy, Study of the Reserves and Surpluses of Health Insurers in Massachusetts 27 (2010). This equivocal statement does not establish that it is categorically improper to consider such assets in calculating reserves. Moreover, as the presiding officer concluded, the May 2010 study did not

distinguish between for-profit and non-profit insurance entities, and there was no evidence that Massachusetts entities "are subject to a statute like ours that mandates a return of funds to political subdivisions in excess of the costs of administration, claims, reserves and purchase of reinsurance."  In light of the scant authority the respondents offer for their argument, we are not persuaded that the presiding officer miscalculated the funds to be returned to HealthTrust's members.

### 3.  Purchase of Reinsurance

The respondents argue that because there is no statutory requirement that they purchase reinsurance, the presiding officer erred by requiring HealthTrust to purchase it.  We agree.  RSA chapter 5-B does not mandate that a risk pool management program purchase reinsurance.  RSA 5-B:5, I(c) lists the "purchase of excess insurance" as one of the purposes for which a pooled risk management program <u>may</u> retain assets, however, it also lists "administration" and "claims" as two of the other purposes for which such a program may retain assets.  By requiring HealthTrust to purchase reinsurance in the future, the presiding officer impermissibly modified RSA 5-B:5, I(c). Accordingly, we also vacate this portion of the presiding officer's order. However, this ruling should not be interpreted to mean that HealthTrust again may accumulate excessive reserves as it was found to have done in the past. As the presiding officer recognized, calculation of the reserves necessary for HealthTrust to retain must be made pursuant to a "generally accepted actuarial analysis."  Moreover, any decision about reinsurance must be consistent with the mandate that HealthTrust return amounts in excess of its reserves in "cash, dividends or similar cash equivalents" to its political subdivision members.

### 4.  Transfer of $17.1 Million

The respondents argue that because the Bureau lacked regulatory authority until 2010, the presiding officer's order that P-L Trust repay HealthTrust $17.1 million constituted an unconstitutional exercise of power by the presiding officer in violation of Part I, Article 23 of the State Constitution. According to the respondents, the presiding officer's decision constituted a "retroactive exercise of power" in violation of Part I, Article 23 because the $17.1 million represents amounts that HealthTrust transferred to LGC to subsidize Workers' Compensation Trust before 2010.  The respondents argue that the presiding officer's order "creates new obligations and duties . . . because LGC has been ordered to undo transfers between its risk pools that were executed before the Bureau had any power to regulate them."

Part I, Article 23 of the New Hampshire Constitution provides: "Retrospective laws are highly injurious, oppressive, and unjust.  No such laws,

18

therefore, should be made, either for the decision of civil causes, or the punishment of offenses."  "The underlying purpose of this prohibition is to prevent the legislature from interfering with the expectations of persons as to the legal significance of their actions taken prior to the enactment of a law." Maplevale Builders v. Town of Danville, 165 N.H. 99, 107 (2013).  "Every statute, which takes away or impairs vested rights, acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past must be deemed a retrospective law."  Id. at 107-08 (quotation omitted).

Here, the presiding officer's order creates no "new obligations."  Although the Bureau lacked the authority to enforce RSA chapter 5-B until 2010, RSA 5-B:5, I(c) has always required pooled risk management programs to return to their political subdivision members "all earnings and surplus" in excess of expenditures for administration, claims, reserves, and the purchase of reinsurance.  By requiring the $17.1 million to be repaid, the presiding officer was merely enforcing an existing statute, not creating any new standards. Further, the constitutional prohibition against retrospective laws exists to protect vested rights.  The respondents could not have had any vested right in monies retained in violation of the plain language of the statute.

C.  Recusal of Presiding Officer

The respondents contend that the presiding officer violated their state and federal constitutional rights to due process when he declined to recuse himself.  See N.H. CONST. pt. I, art. 35; U.S. CONST. amend. XIV.  They argue that he had an incentive to rule in the Bureau's favor because he was temporarily employed by the secretary of state and had statutory authority to require them to pay the Bureau's attorney's fees and costs.  They also argue that he had a direct, pecuniary interest in the proceedings because he was paid bi-weekly, and was not paid a flat rate.  They contend that, because the presiding officer was paid bi-weekly, he had an incentive to prolong the proceedings unnecessarily by, for instance, denying their prehearing motion to dismiss.

We first address the respondents' arguments under the State Constitution and rely upon federal law only to aid in our analysis.  State v. Ball, 124 N.H. 226, 231-33 (1983).  Part I, Article 35 of the State Constitution mandates that all judges "be as impartial as the lot of humanity will admit." This provision applies to quasi-judicial officers, such as the presiding officer in this case.  See Appeal of City of Keene, 141 N.H. 797, 801 (1997).  A conflict of interest exists if an official has a direct pecuniary or personal interest in the outcome of the proceedings that is immediate, definite, and capable of demonstration or any connection with the parties in interest as would likely

improperly influence his or her judgment. Appeal of Hurst, 139 N.H. 702, 704 (1995).

However, "claims of judicial partiality must be raised at the earliest moment that a litigant becomes cognizant of the purported bias." Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 857 (1st Cir. 1998). "[A] party, knowing of a ground for requesting disqualification, can not be permitted to wait and decide whether he likes subsequent treatment he receives." In re United Shoe Machinery Corporation, 276 F.2d 77, 79 (1st Cir. 1960). "[A] litigant who proceeds to trial knowing of potential bias by the trial court waives his objection and cannot challenge the court's qualifications on appeal." Matter of Welfare of Carpenter, 587 P.2d 588, 592 (Wash. Ct. App. 1978); see Hutchinson v. Railway, 73 N.H. 271, 276-77 (1905).

In this case, the respondents did not move to disqualify the presiding officer until the last day of a ten-day evidentiary hearing, fully eight months after the Bureau initiated these proceedings, and after the presiding officer had already issued approximately fifty prehearing and preliminary orders. The certified record establishes that most, if not all, of the relevant information upon which the respondents relied was available to them in October 2011, long before they moved to disqualify the presiding officer. At an October 4, 2011 pre-hearing conference, the respondents questioned whether the presiding officer had any conflict of interest. The presiding officer explained that he did not have a conflict of interest, but volunteered that: (1) he was no longer a State employee, but was retained by the State to be the presiding officer in these proceedings pursuant to a vendor contract; (2) his contract expired on December 22, 2011, but, if the proceedings were not concluded by then, he might be asked to continue as hearing officer; and (3) he was paid "over $400.00 a day" for his services, which he received in $5,000 increments. As of that conference, the respondents had submitted a request for additional information about the presiding officer's potential conflicts, but had not yet received a response. The certified record shows that the respondents did not pursue their request until May 11, 2012, the day the evidentiary hearing concluded.

"In these circumstances, there is an obligation on the part of the movants to make a strong showing that they were not waiting until the last minute as a [litigation] tactic." Demoulas v. Demoulas Super Markets, Inc., 703 N.E.2d 1141, 1146 (Mass. 1998). The timing of the respondents' motion "makes it inherently suspect." Id.; see United States v. De Castro-Font, 587 F. Supp. 2d 353, 358 (D. P.R. 2008) (court will scrutinize timeliness of motion to disqualify to determine if motion is "purely pretextual"). The respondents have failed to demonstrate that their motion to disqualify the presiding officer was not a last-minute attempt to avoid an adverse decision. See Demoulas, 703

N.E.2d at 1146. Thus, we treat their objection to the presiding officer on the grounds of bias as waived.

As the Federal Due Process Clause affords the respondents no greater protection than Part I, Article 35 of the State Constitution under these circumstances, we reach the same result under the Federal Constitution as we do under the State Constitution. See, e.g., Rodriguez-Hernandez, 132 F.3d at 857.

D.  Attorney's Fees

"New Hampshire generally follows the American Rule; that is, absent statutorily or judicially created exceptions, parties pay their own attorney's fees." Shelton v. Tamposi, 164 N.H. 490, 501 (2013).  We review an award of attorney's fees under our unsustainable exercise of discretion standard, giving deference to the fact finder's decision. See id.  To be reversible on appeal, the discretion must have been exercised for reasons clearly untenable or to an extent clearly unreasonable to the prejudice of the objecting party. Id.

The respondents concede that the presiding officer had authority to order attorney's fees pursuant to RSA 5-B:4-a, V, which provides:

> In any investigation to determine whether any person has violated or is about to violate this chapter or any rule or order under this chapter, upon the secretary of state's prevailing at hearing, or the person charged with the violation being found in default, or pursuant to a consent order issued by the secretary of state, the secretary of state shall be entitled to recover the costs of the investigation, and any related proceedings, including reasonable attorney's fees, in addition to any other penalty provided for under this chapter.

The respondents urge us to vacate the award of fees and costs in this case because the presiding officer awarded the Bureau all of its fees and costs, even though it prevailed on only some of its claims.  "Where a party prevails on some claims and not others, and the successful and unsuccessful claims are analytically severable, any fee award should be reduced to exclude time spent on unsuccessful claims." Van der Stok v. Van Voorhees, 151 N.H. 679, 685 (2005) (quotation omitted).  However, the Bureau contends, and the respondents do not dispute, that "the costs submitted by the Bureau did not include fees for those claims on which the Bureau did not prevail." Nonetheless, because we have vacated portions of the presiding officer's decision, we also vacate his award of attorney's fees and costs to allow the

parties an opportunity to litigate the extent to which, if any, our decision has affected the amount of fees to which the Bureau is entitled.

<u>Affirmed in part; vacated in part; and remanded</u>.

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred.