NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Health Services Planning and Review Board
No. 2014-0674


APPEAL OF THI OF NEW HAMPSHIRE AT DERRY, LLC
(New Hampshire Health Services Planning and Review Board)

Argued: September 16, 2015
Opinion Issued: January 12, 2016


Andrew Eills Law Offices, PLLC, of Concord (Andrew B. Eills on the brief and orally), for the petitioner.


Joseph A. Foster, attorney general (Kenneth A. Sansone, attorney, on the brief and orally), for the State.


LYNN, J. In this appeal from an order of the Health Services Planning and Review Board (Board), the petitioner, THI of New Hampshire at Derry, LLC (THI), argues that the Board incorrectly interpreted RSA 151-C:4, III(a) as preventing the Board from granting a certificate of need (CON) to THI for the construction of a nursing home. See RSA ch. 151-C (Supp. 2015) (repealed by Laws 2013, 144:84, eff. June 30, 2016). Finding no error, we affirm.

The following facts are derived from the record. THI is a subsidiary of THI of New Hampshire, LLC, itself a subsidiary of a parent company that owns nursing home operators throughout the country. In approximately 2003, THI purchased and began operating a nursing home, Pleasant Valley Nursing Center (Pleasant Valley), in Derry.

In 2012, THI had an opportunity to expand when Exeter Healthcare, Inc. closed its nursing home in Exeter and offered to sell its 109 licensed nursing beds. THI and Exeter Healthcare entered into a purchase and sale agreement for the beds on January 25, 2013, and THI made deposit payments to Exeter Healthcare in accordance with the agreement.

The following month, THI requested that the Board grant approval for the transfer of the beds from Exeter Healthcare to THI. Because the Pleasant Valley building would not accommodate all of the beds to be transferred, THI also requested permission to apply for a CON to construct a new building to house the beds in a different location. THI selected a site in Londonderry for the new building, which it planned to operate under the name Traditions at Londonderry. In its application, THI explained that the transfer would occur in the same nursing home region in Rockingham County, such that the number of beds in the region would not increase. THI also informed the Board that its contract conditioned its obligation to buy the beds from Exeter Healthcare upon the Board's approval of the CON for Traditions at Londonderry.

The Board met on February 21, 2013, and questioned whether it had statutory authority to approve THI's requests. RSA 151-C:4 effectively creates a moratorium by barring construction of new nursing home facilities in the state unless the applicant obtains a CON from the Board, which may issue a CON only under very limited circumstances. See RSA 151-C:4, I, III (a). Under one such exception, the Board "may" issue a CON "for construction or renovation as necessary to repair or refurbish an existing facility, or to accommodate additional beds obtained by transfer to an existing facility." Id. (emphases added). The Board looked to the statutory definition of "Health care facility" and found that it encompassed "licensed nursing homes including all services and property owned by such." RSA 151-C:2, XV-a (emphasis added). Based upon this definition, the Board concluded that it had authority to approve the bed transfer and gave THI permission to apply for a CON, apparently finding that Pleasant Valley was an "existing facility" and that the proposed Londonderry facility would be "property owned by such."[1] The Board conditioned its ruling upon THI submitting the CON application within 24 months, so that THI would not "hold [the beds] hostage."

THI submitted its CON application in September 2013. The Board deemed the application "complete" and commenced formal review in December 2013. In accordance with RSA 151-C:8, XII, THI submitted a request to amend its application in February 2014 to include an improved design. The Board approved the request, and THI submitted its amendment the following month.

---

[1] Neither party challenges the Board's conclusion that a newly constructed (or to be constructed) facility remotely located from the one currently operated by the applicant can qualify as an "existing facility" within the meaning of the statute. We thus have no occasion to resolve this issue.

2

Formal review commenced again on April 25, 2014, with the 90-day formal review period ending on July 25, 2014. As required by RSA 151-C:8, X, the Board held a public hearing on June 19, 2014, which continued on July 17, 2014.

Before the Board deemed THI's initial application complete, unrelated litigation resulted in an agreement to transfer ownership of Pleasant Valley from THI to a third party. The third party's attorney contacted the Board in May and again in October 2013 to notify it of the fact that Pleasant Valley would be transferred to the third party as of December 2013.

In November 2013, the Board asked THI to clarify how this change of ownership of Pleasant Valley would affect THI's CON application. Specifically, the Board questioned who would "be the rightful CON applicant" following the transfer. THI informed the Board that it remained the applicant and that it was not in any way affiliated with the third party transferee of Pleasant Valley. However, it nonetheless asserted that the Board should consider THI as an "existing facility" excepted from the statutory moratorium. The Board approved the transfer of Pleasant Valley to the third party on December 10, 2013. According to THI, the transfer of Pleasant Valley was complete as of January 1, 2014.

The Board undertook a full review of THI's status as the CON applicant following the transfer of Pleasant Valley, addressing the issue in correspondence with THI, at public hearings, and in consultation with the Attorney General. At the conclusion of its July 17, 2014 meeting, the Board voted unanimously to deny THI's CON application. In an August 21, 2014 memorandum confirming its decision, the Board detailed its findings pursuant to RSA 151-C:7 and applicable regulations. See N.H. Admin. Rules, He-Hea 303.01. Although the Board found that THI's proposed facility would satisfy regulatory requirements for services offered, quality of care, and financial feasibility, among other criteria, the Board nevertheless denied THI's application because it was not an "existing facility." The Board reasoned that Pleasant Valley had been the only New Hampshire facility operated by THI, and THI's ownership of Pleasant Valley had formed "the basis upon which the transfer of beds was approved by the [Board], which then allowed a CON application to be filed."[2] In reaching its decision, the Board relied in part on precedent set by its past adjudications "requir[ing] that any transferred beds be: (1) kept in the same nursing home region in order to maintain the

---

[2] The record reflects that THI's ownership of Pleasant Valley had been material to the Board's February 2013 deliberations, when it first gave THI permission to apply for a CON. The Board's minutes from its February 21, 2013 meeting state that THI submitted its requests "for the Pleasant Valley Nursing Center." In a February 27, 2013 letter to counsel for THI, the Board stated that it had "considered the requests submitted by [THI], d/b/a Pleasant Valley Nursing Center."

requirements of the statutory bed need formula; and (2) placed at a facility where existing nursing beds are in operation." THI moved for reconsideration, which the Board denied, and this appeal followed.

Appeals from a decision of the Board are brought pursuant to RSA 151-C:10, which incorporates by reference the provisions of RSA chapter 541 (2007). Appeal of Parkland Med. Ctr., 158 N.H. 67, 70 (2008). We will affirm the Board's decision unless we find it to be "arbitrary or capricious or not made in compliance with applicable law." RSA 151-C:10, III; see Appeal of Parkland, 158 N.H. at 70. The burden of proof is on "the party seeking to set aside any order or decision of the [Board] to show that the same is clearly unreasonable or unlawful." RSA 541:13.

THI contends that the Board incorrectly applied the statutory moratorium found in RSA 151-C:4, III because THI had an existing facility — Pleasant Valley — when it first petitioned the Board for a CON to construct a new facility, and under the statute, an exception to the moratorium allows for the transfer of beds to an "existing facility." See RSA 151-C:4, III(a) ("[A] certificate of need may be issued . . . to accommodate additional beds obtained by transfer to an existing facility."). THI also argues that the Board's denial of THI's CON application was arbitrary, capricious, and unlawful because the Board based its denial on the transfer of Pleasant Valley, yet the Board approved that very transfer during the CON completeness review process.

To resolve these issues, we must engage in statutory interpretation. See Appeal of Michele, ___ N.H. ___, 123 A.3d 255, 258 (2015). "Statutory interpretation is a question of law, which we review de novo." Petition of Malisos, 166 N.H. 726, 729 (2014). In matters of statutory interpretation, we are "the final arbiter of the legislature's intent as expressed in the words of the statute considered as a whole." Appeal of Town of Seabrook, 163 N.H. 635, 644 (2012). "We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning." Appeal of Local Gov't Ctr., 165 N.H. 790, 804 (2014). "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include." Id. "We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result." Id. "Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole." Id. "This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme." Id. Additionally, "[w]hen the language of a statute is plain and unambiguous, we need not look beyond the statute itself for further indications of legislative intent." Petition of Malisos, 166 N.H. at 729.

4

We begin by examining the language of RSA 151-C:4, I, which creates a statutory moratorium on construction of new nursing homes: "No new institutional health service shall be offered or developed within the state, nor shall any arrangement or commitment for financing the offering or developing of a new institutional health service be made, except pursuant to obtaining a [CON] for such service." RSA 151-C:4, III(a) then directs the Board: "No new [CON] shall be granted . . . for any nursing home, skilled nursing facility, intermediate care facility, or rehabilitation facility . . . through the period ending June 30, 2016."

The statute provides for limited exceptions to this prohibition on the Board's authority to grant a CON. See RSA 151-C:4, III. The Board "shall" issue a CON "for replacement or renovation of existing beds as necessary to meet life safety code requirements or to remedy deficiencies noted in a licensing inspection pursuant to RSA 151 or state survey and certification process pursuant to titles XVIII and XIX of the Social Security Act." RSA 151-C:4, III(a). Additionally, the Board "may" issue a CON "for construction or renovation as necessary to repair or refurbish an existing facility, or to accommodate additional beds obtained by transfer to an existing facility." Id. The statute qualifies the exception for the transfer of beds to an "existing facility" as follows:

> In the case of repair, refurbishment, or transferred beds, the resulting costs in excess of the current capital expenditure threshold as adjusted for inflation pursuant to RSA 151-C:5, II(f)(1) shall not be reflected in any state Medicaid rate. Any application for a certificate of need under this subparagraph shall indicate whether it is for a life safety code requirement or to remedy deficiencies noted in a licensing inspection or whether it is for repair or refurbishment of an existing facility or for transferred beds. If the application is approved, it shall be deemed that the board has agreed with the indicated reason for such application.

Id.

The statute does not define "existing" or "existing facility," but RSA 151-C:2, XV-a defines the term "Health care facility" as "hospitals, ambulatory surgical facilities, specialty hospitals and licensed nursing homes including all services and property owned by such." Furthermore, "[h]ealth care facilities shall include facilities . . . which are licensed or required to be licensed in whole or in part by the state." Id. The statute also defines "Physical facility or site" as "the total buildings, structures, and land of a health care facility." RSA 151-C:2, XXIX.

We assume, without deciding, that, at the time it was owned by THI, Pleasant Valley nursing home could have been the same "health care facility" as THI's proposed new location, Traditions at Londonderry, because the legislature so broadly defined the terms "health care facility" and "physical facility." See RSA 151-C:2, XV-a; RSA 151-C:2, XXIX. Regardless of what might comprise a "facility," however, that facility must be "existing" for the Board to approve any transfer of beds to it. See RSA 151-C:4, III(a). We turn, then, to the meaning of the term "existing facility."

Because the term "is not defined in the statute, we look to its common usage, using the dictionary for guidance." K.L.N. Construction Co. v. Town of Pelham, 167 N.H. 180, 185 (2014). We have interpreted the term "existing facility," as used in RSA chapter 151-C, by looking to the dictionary definition of "existing," which is "to have actual or real being." Appeal of Parkland, 158 N.H. at 75; see Webster's Third New International Dictionary 796 (unabridged ed. 2002).

The State argues that the term "existing facility" in RSA 151-C, III(a) is clear and unambiguous, and that a facility must be "existing" when the Board acts on the merits of the CON application, not merely when the application is submitted or when the Board deems the application complete for purposes of commencing its review. THI, on the other hand, contends that a facility need not remain "existing" throughout the course of the Board's CON review. According to THI, "existing" means only that the facility must exist when the CON applicant obtains beds by transfer. We agree with the State.

In interpreting "existing facility," we do not examine the phrase in isolation. See Local Gov't Ctr., 165 N.H. at 804. The statute states that a CON "may be issued for construction or renovation as necessary to repair or refurbish an existing facility, or to accommodate additional beds obtained by transfer to an existing facility." RSA 151-C:4, III(a) (emphasis added). Further, the statute broadly provides that "[n]o new certificate of need shall be granted by the board." Id. (emphasis added). The statute specifies the requirements that must be met — including that there be an existing facility — when the Board "grants" or "issues" a CON. In other words, the facility must exist when the Board engages in its final review and either approves or denies the request, and not merely at the time the applicant files its application or obtains beds by transfer. If the legislature meant the latter, it could have said that in the statute. We do not add language that the legislature did not see fit to include, Local Gov't Ctr., 165 N.H. at 804, and THI's reading of the statute would require us to do exactly that.

THI seems to suggest that once its application was accepted as complete, the Board all but agreed to issue a CON. However, that is not a reasonable interpretation of the statutory scheme. There would be no need for the review process contemplated by the statute if the Board's decision to accept an

6

application as complete was the equivalent of granting the application. THI relies heavily on the fact that the Board initially found that Traditions at Londonderry could be an "existing facility" for purposes of the transfer of beds from Exeter Healthcare, and then gave THI permission to apply for a CON on that basis. However, these initial findings by the Board were interlocutory and did not preclude the Board from reassessing the situation based upon the changed circumstances that existed at the time it considered THI's application for approval on the merits. Cf. Radziewicz v. Town of Hudson, 159 N.H. 313, 315 (2009) (reciting the general principle that a "trial court has the power to reconsider an issue until final judgment or decree"). Likewise, the fact that the Board approved the transfer of Pleasant Valley to an unrelated third party provides no basis to interpret the statute in the manner THI advocates. THI suggests that the Board should have informed THI, at the time it approved the transfer of Pleasant Valley to the third party, that such transfer could affect THI's CON application, but did not do so. To the contrary, the record shows that the Board reached out to THI and asked questions about the transfer and the CON. THI does not explain what more the Board could or should have done, and provides no basis for its assertion that the onus was on the Board to notify the applicant more specifically that its actions might affect its pending application.

THI also contends that the Board erroneously and unlawfully relied on its precedent set in prior adjudications. In its order denying THI's application, the Board noted that it previously had denied a transfer of nursing beds to a facility that operated only residential care beds because the transfer would be akin to establishing a new institutional health service, in violation of the moratorium on nursing home beds. The Board required that transferred beds be placed at a facility where existing nursing beds were already in operation. It is not clear to what extent the Board relied on this precedent in reaching its final decision. However, regardless of the extent of such reliance, we agree with the Board that the term "existing facility" cannot be stretched so far as to include an entirely new facility that no longer has any relationship to another operating facility owned by the applicant at the time the Board is asked to grant the CON.

THI also argues that the Board's decision contradicts the statute's purpose, which THI claims is to keep beds in service. However, the plain language of the statute reflects that this goal is to be accomplished only in the narrow circumstances to which the statute applies. Here, THI did not meet the requirement that it have an existing facility, and the Board had no authority to ignore this requirement to further an arguably more general statutory objective. See State v. Dor, 165 N.H. 198, 205 (2013) ("[I]t frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the

statute's primary objective must be the law." (quotation omitted)).[3]  Therefore, we conclude that the Board properly interpreted RSA 151-C:4 as preventing it from approving THI's CON application.

Affirmed.

HICKS, CONBOY, and BASSETT, JJ., concurred.

---

[3] As explained in the text, even if the primary purpose of the statute is to avoid a decrease in the number of beds, that cannot override the clear statutory language.  Moreover, it is far from clear that this is the primary purpose, given the arguably conflicting objective evidenced by the moratorium on new nursing facilities.